NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 98

No. 2015-002

| State of Vermont | Supreme Court |
|---|---|
| | |
| | On Appeal from |
| v. | Superior Court, Caledonia Unit, |
| | Criminal Division |
| | |
| Allen Prue | May Term, 2016 |

Robert R. Bent, J.

Lisa A. Warren, Caledonia County State's Attorney, and Kirk L. Williams, Deputy State's
  Attorney, St. Johnsbury, for Plaintiff-Appellee.

Allison N. Fulcher of Martin & Associates, Barre, for Defendant-Appellant.


PRESENT: Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.


¶ 1.    **ROBINSON, J.**   Defendant was convicted of first-degree murder, conspiracy to commit murder, and attempted kidnapping following a jury trial. On appeal, he makes four claims. First, he argues that his confession on March 27, 2012, should be suppressed because his waiver of his <u>Miranda</u> rights and ensuing confession were not voluntary. Second, he argues the trial court committed reversible error when it excluded evidence of his wife's psychiatric diagnosis. Third, he contends that the trial court erred in admitting evidence of his wife's internet search history. Finally, defendant argues his sentence should be reversed and remanded because the trial court abused its discretion in denying his motion to continue his sentencing so that certain witnesses could testify. We find no error and affirm defendant's convictions and sentence.

¶ 2.    We address each argument in turn, providing the salient facts as relevant to each of defendant's arguments.

## I. Motion to Suppress Defendant's Statements

¶ 3.    In considering defendant's motion to suppress, the trial court made the following findings, which are supported by substantial evidence.

¶ 4.    On March 25, 2012, the victim, Melissa Jenkins, phoned a friend and reported that a woman had called asking her to help a person who used to plow her driveway because his car had broken down. The victim told her friend that she was going to help, but felt uneasy and wanted someone to know. She gave her friend the phone number from defendant's business card.

¶ 5.    After a period of time, the friend became concerned when he had not heard back from the victim. He went to look for her and found her car running on the side of the road with her two-year old son sitting in the back, and no sign of the victim. The friend then phoned the Vermont State Police. When the police arrived at the scene of the crime, they found a hat and identified the phone number and plow business to be defendant's. In addition, they found defendant's business card on a table in the victim's home.

¶ 6.    As a result of this evidence, defendant became a potential witness to what was at that point a missing person case. Accordingly, the police went to defendant's home in the early morning hours of March 26, 2012. Defendant and his wife were up and about when the police arrived because his job as a paper-delivery person required an early start. The police interviewed both defendant and his wife about where they had been that day and whether either of them had had contact with the victim. With the consent of defendant and his wife, the police searched defendant's home, outbuildings, and motor vehicles. The trial court found this first contact to be significant because it was through this initial contact that defendant and his wife became aware that they were in police focus concerning the victim's disappearance. The next day, the victim's body was discovered.

2

¶ 7.     Coincidentally, several weeks earlier, defendant's wife had reported to the police concerns about unauthorized use of her credit card.  She suspected that her ex-husband was involved.  Around 3:00 p.m. on March 26—the afternoon following the victim's disappearance— defendant and his wife appeared unannounced at the Vermont State Police barracks to speak with someone further about this "identity theft" issue.  The trial court found that defendant later admitted that the purpose of him visiting the barracks was to "find out what the police knew" regarding the victim's homicide.  Police officers offered defendant and his wife water and then kept the cups they used for DNA testing.  In addition, with defendant's wife's consent, they downloaded the contents of her cell phone.  Unbeknownst to defendant and his wife, this interaction was recorded through a hidden camera and microphone.

¶ 8.     The next day, March 27, the police invited defendant and his wife back to the station to further discuss their identity theft case.  This was actually a ruse to get the two back in the station so they could be questioned about the victim's death.  Defendant and his wife arrived around 5:30 p.m., and they were separated.  Defendant met with Lieutenant Matthew Nally, who started the interview by telling defendant that he wanted more information about the identity theft case.

¶ 9.     About fifteen minutes into the interview, Detective Todd Baxter knocked on the door and falsely indicated that he was surprised to see defendant at the station because he, Detective Baxter, had just been to defendant's home in order to speak with him further about the victim's death.  Detective Baxter told defendant that he was free to go, as had Lieutenant Nally previously.  For roughly the next hour and a half, the troopers asked about defendant's and his wife's whereabouts on March 25, 2012.  Both troopers were dressed in plain clothes and were armed.  They were in a room of about 100 square feet located in the secure area of the barracks. The door was closed for privacy, and the barracks was busy with officers working on the homicide investigation.  On and off throughout the interview, defendant was offered bathroom breaks and

water or soda, and was reminded that he was free to leave at any time. He kept possession of his cell phone throughout the interview.

¶ 10. The interview lasted a total of seven hours, including travel to various sites. The trial court listened to the audio recording of the interview and found that defendant demonstrated solid general knowledge. For example, the trial court found that defendant spoke clearly about auto mechanics and welding, understood military time, and was aware that the Burger King he and his wife visited the day before the homicide had cameras that the police could use to cross-check his statements. In addition, the trial court found that defendant's overall speech pattern was good, his language was detailed, and he was generally forthcoming with information, except for instances where defendant struggled out of an apparent attempt to avoid incriminating himself or his wife.

¶ 11. The two troopers used a number of interview techniques with defendant, including rapport-building, minimizing and maximizing the severity of the offense, and victim blaming. The trial court found that as the officers worked through defendant's timeline, a fair amount of banter took place between the officers and defendant. Defendant remained engaged in the conversation and on multiple occasions when asked if he wanted to continue talking, defendant said he was happy to do so. This rapport-building had some effect on defendant, as evidenced by his willingness to share ever more intimate details about his life, including his sexual relations with his wife.

¶ 12. Although defendant expressed anxiety about being questioned as to the victim's homicide, he understood the overall dynamic of the interview and that the officers were investigating him. The trial court cited one example from the interview where defendant "mentioned that he knew [the police] would have done a background check on him" before their conversation. In addition, defendant told the officers he was aware of their techniques, stating, for example, "this little technique right here, you guys saying your wife has already given up . . . That's you guys' technique." One final example the trial court gave regarding defendant's overall

4

understanding of the dynamic of the interview was his reaction to being charged with penetrating the victim. When confronted, defendant said "I mean, the autopsy should have proved that."

¶ 13. Approximately two hours into the interview, after reviewing defendant's activities of March 25, the officers gave defendant <u>Miranda</u> warnings. The trial court excerpted the relevant dialogue from the transcript of the interview:

> **N = Lieutenant Nally**
>
> **B = Detective Baxter**
>
> **D = Defendant**

B: All right. So what we have to do is I just have to transition from . . .

N: Finish that up?

B: . . . from this to getting you to say that this is the truth. Is there anything that you want to change in this?

D: No.

B: Okay. There are some formalities that for documentation purposes before that we swear to anything. And I have to swear to it, and he [Lieutenant Nally] has to swear to it, . . . and you have to swear to it. There is what's called, for purpose of documentation . . .

N: Yeah, this is the standard . . .

B: It basically says that you don't . . .

N: It's the standard . . .

B: . . . you don't have to talk to us.

D: Right.

B: So before we ask you to swear to anything we want to make sure that you don't have to talk to us.

D: Right.

5

B:  So that's it.  And because, I mean, you've watched all the cop shows, you've watched everything.  You're not under arrest or any of the above.

D:  Right.

B:  But we want to make sure that you understand fully that you don't have to talk to us.

D:  Right.

B:  And some people think, you know, there are so many times, I mean, we have to read this.  You watch all—do you watch cop shows at all?

D:  Yeah.

B:  We have to, we have to read them every single time.

N:  Okay.  It's 1919.  Do you want me to go through this, Todd?

B:  Yeah.

N:  Do you want me to do it or?

B:  I mean, I don't care.  He can read them, too, or you can read them to him.

N:  All right, we'll just do it together, how does that sound?  Just move your phone and water, please, for me.

D:  I suck at reading, so.

N:  All right, well I'll read it aloud to you and you can follow me along.

B:  Yeah.  Do you write?

D:  What do I need to write?

B:  If I were to write, do you want me to transcribe and write this statement that you've given me later?

D:  Yeah.

B:  Okay, all right.

N:  Perfect.  Okay, number 1:  You have the right to remain silent.  Do you understand?

6

D: Yeah.

N: Okay. Anything you say, anything you say can and will be used against you in a court of law. Understand?

D: Yeah.

N: I'm just going to put a check that I've done that. You have the right to talk to a lawyer before questioning and to have a lawyer present with you during questioning. Do you understand?

D: Yeah.

N: Okay. If you cannot afford to hire a lawyer, one will be appointed to represent you at public expense before any questioning if you wish. In Vermont that is called a Public Defender.

D: Okay.

N: If you decide to answer questions, you may stop the questioning at any time.

D: Okay.

N: All right? Do you understand each of the rights I've explained to you?

D: Yeah.

N: Okay. Okay, do you want to talk to me now? Yes or no.

D: Yeah.

N: Yes? Okay, all right. And then it just says waiver. I've been advised that I have the right to remain silent, to be represented by a lawyer, to talk with one prior to questioning and to have one present during questioning. Knowing my rights, I agree to waive them and talk to you now. No threats or promises have been made to me. Understand?

D: Yeah.

N: Okay. You can sign right there for me, please. Did you finish high school?

D: No, I didn't.

N: What grade did you get to?

D: I went partway through 9th.

N: Okay, all right. Did you get your GED or anything like that? I'll just get the time here. 19:21 and 3/26/12.[1]

D: Is that the new Blackberry?

N: It's actually pretty old.

D: I thought the bold was new.

B: No, the Curve is new now. It's Flip. It's not a Flip-it.

D: Well, that's what this one is. The Blackberry Curve and I've had it for a couple of years.

B: No, that's the Bold. They have a new Curve now that . . .

N: This is Bold. This is the Bold.

B: Right, that rises up. The front face flips. It doesn't flip up but it slides up. It's a slide.

N: What do you have?

D: This is the Blackberry Curve.

N: Okay, so that's newer than mine.

B: And you're going to sign too?

N: Yeah, yeah.

T: All right.

D: Hey, hey, so what's next?

B: Well, we're going to—here's what's next. What I plan on doing is we're basically going to swear you.

D: Okay.

B: We're all going to raise our right hands. I mean, and we're going to tell the truth here. So as soon as [Lieutenant Nally] is done . . .

---

[1] As the trial court noted, at the hearing held on April 18, 2014, "Detective Nally testified that the correct date was in fact the 27th, not 26th as he erroneously entered at the time."

N: I'll just set this over here.

B: I'm going to go over this time line.  So let's raise our right hand.
Do you, [defendant], swear to tell the truth and nothing but the truth?

D: I do.

N: I do.

B: Sgt. Nally?

N: I do.

B: And you have to ask me.

N: Do you swear to tell the truth, [Detective] Baxter?

D: I do.

B: All right.  So let's go over this statement.

During this exchange, defendant executed a written waiver of his <u>Miranda</u> warnings.

¶ 14.  The trial court found, after having listened to the entirety of the audio recording and reading the transcripts, that the recording documented "a sufficient pause immediately before the warnings, as well as between each one, to give more emphasis [regarding the warnings]" than the transcript reflects when reduced to writing.  In addition, the court found that defendant was "quite observant and responsive to the conversational flow and had a better grasp of police procedures than might be expected."

¶ 15.  The trial court acknowledged the peculiar circumstances surrounding defendant's <u>Miranda</u> waiver.  In particular, the trial court noted that:

> There is little question that the troopers' interview structure just prior to the administration of the warning was awkward and did not make for a smooth transition to the warnings, as [the officers] were telling [defendant] that everyone would be swearing to the truth of things said in the preceding hour and fifty minutes or so, which was dedicated predominately to the preliminary timeline given by [defendant].

However, the trial court found that this peculiarity did not undermine its conclusion that defendant generally understood what was happening during the Miranda waiver.

¶ 16.    About an hour after these Miranda warnings, the officers began pressing defendant harder with respect to his truthfulness. In the course of that discussion, defendant mentioned that he used to "spit shake" on a promise to tell the truth. Detective Baxter followed up on that statement and engaged in a "spit-shake" in which defendant affirmed his commitment to tell the truth. The trial court found that Detective Baxter "did not use the opportunity to physically intimidate or overpower" defendant.

¶ 17.    The officers then began to confront defendant with information they had that connected him to the victim's murder. As he was confronted with the evidence against him, he admitted to strangling the victim. After this initial confession, defendant took the officers to the site where the victim's body was found, then to New Hampshire where defendant and his wife burned their clothes and other items, and then to where defendant discarded the cell phone he had used to contact the victim. When they returned to the barracks, defendant gave a complete statement. Miranda warnings were not readministered.

¶ 18.    The trial court found that throughout the interview, the troopers offered defendant water or soda on multiple occasions, and offered him the chance to use the bathroom and smoke cigarettes. In addition, the officers asked defendant several times whether they had treated him fairly, to which defendant answered in the affirmative. After the interview, defendant was taken to jail.

¶ 19.    Before trial, defendant moved to suppress his March 27 statement. At the suppression hearing, defendant's expert, a psychologist, opined that defendant did not adequately understand his Miranda rights in relationship to the investigation of the homicide. The expert determined that defendant's IQ was 75. As the trial court noted, the expert seemed to conclude that the identity theft investigation was the topic under discussion at the time the troopers

administered the <u>Miranda</u> warnings. In addition, the expert suggested that the "swearing ceremony" that accompanied the <u>Miranda</u> warnings was designed to disguise the purpose of the rights. The trial court denied the motion to suppress.

¶ 20. On appeal, defendant seeks reversal of the trial court's denial of his motion to suppress on three bases. First, defendant argues the State failed to prove that defendant validly waived his <u>Miranda</u> rights when the troopers first administered them about two hours into the interview. Second, defendant argues that even assuming he validly waived his <u>Miranda</u> rights after the initial warnings were given, a second set of warnings should have been given closer to the time of the spit-shake and the more intense questioning that began about an hour after the initial warnings. Third, defendant argues that his confession was not voluntary because, under the totality of the circumstances, his will was overborne, therefore rendering the confession involuntary.

### A. Initial <u>Miranda</u> Waiver

¶ 21. The Fifth Amendment provides every citizen with the right not to be "compelled in any Criminal Case to be a witness against himself [or herself]." U.S. Const. amend. V. In <u>Miranda v. Arizona</u>, the U.S. Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless . . . the person [has been] warned that he [or she] has a right to remain silent, that any statements he [or she] does make may be used as evidence against him [or her], and that he [or she] has a right to the presence of an attorney, either retained or appointed." 384 U.S. 436, 444 (1966). The "main purpose of <u>Miranda</u> is to ensure that an accused is advised of and understands the right to remain silent and the right to counsel." <u>Berghuis v. Thompkins</u>, 560 U.S. 370, 383 (2010). However, a suspect may waive his or her <u>Miranda</u> rights, "provided the waiver is made voluntarily, knowingly, and intelligently." <u>Treesh v. Bagley</u>, 612 F.3d 424, 433 (6th Cir. 2010) (quoting <u>Miranda</u>, 384 U.S. at 444); see <u>State v. Brooks</u>, 2013 VT 27, ¶ 10, 193 Vt. 461, 70 A.3d 1014.

11

¶ 22. In order to determine whether a suspect has validly waived his or her <u>Miranda</u> rights, we employ a "totality of the circumstances" test. <u>Brooks</u>, 2013 VT 27, ¶¶ 22-23. The waiver inquiry has "two distinct dimensions." <u>Berghuis</u>, 560 U.S. at 382 (quotation omitted).

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the <u>Miranda</u> rights have been waived.

<u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986) (quotation omitted). This overall question of waiver must be assessed in light of the "particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." <u>United States v. Plugh</u>, 648 F.3d 118, 127 (2d Cir. 2011) (quotation omitted). The State bears "the heavy burden of showing a waiver." <u>State v. Malinowski</u>, 148 Vt. 517, 520, 536 A.2d 921, 923 (1987). Under the totality-of-the-circumstances approach, this Court accords "great deference to the trial court's findings," and these findings must stand "if they are not clearly erroneous." <u>Id.</u>

¶ 23. Under the U.S. Constitution, whether defendant's waiver and confession were voluntary are ultimately legal conclusions that we review without deference.[2] See <u>State v. Reynolds</u>, 2016 VT 43, ¶ 14, __ Vt. __, __ A.3d __ (citing <u>Miller v. Fenton</u>, 474 U.S. 104, 109-110, (1985) ("Without exception, the Court's confession cases hold that the ultimate issue of 'voluntariness' is a legal question.")); see also <u>State v. Weisler</u>, 2011 VT 96, ¶ 12, 190 Vt. 344, 35 A.3d 970 (recognizing that standard of review governing voluntariness of confessions is "generally

---

[2] Defendant's arguments and the trial court's decision were based on the federal constitution. Defendant has not made any distinct arguments based on the Vermont Constitution.

de novo" and citing cases).[3]  For that reason, we defer to the historical facts as found by the trial court, but review without deference "the ultimate issue" of "whether the State has obtained the confession in a manner that comports with due process."  Reynolds, 2016 VT 43, ¶ 14.

¶ 24.    The standard of review is less clear with respect to the subsidiary question whether a waiver is knowing and intelligent—the central issue in connection with this first strand of defendant's argument.  Some courts have held that the trial court's findings regarding whether defendant knowingly and intelligently waived his or her rights are reviewed for clear error but the question of voluntariness is reviewed de novo.  See, e.g., United States v. Doe, 155 F.3d 1070, 1074 (9th Cir. 1998) (en banc) (explaining that whether waiver was knowing and intelligent is question of fact reviewed for clear error, but voluntariness is mixed question of fact and law reviewed without deference); People v. Aguilar-Ramos, 86 P.3d 397, 400-01 (Colo. 2004) (en banc) (stating that question whether defendant was aware of nature of right and consequences of decision to waive it such that waiver may be deemed knowing and intelligent involves resolution of disputed facts subject to deferential review, but that ultimate determination of whether defendant validly waived Miranda rights requires application of law to historical facts and is reviewed nondeferentially); People v. Goins, 999 N.E.2d 18, 30 (Ill. Ct. App. 2013) (noting ultimate question of voluntariness subject to de novo review, but knowing and intelligent waiver

---

[3] Our statements on this question have not always been consistent, and we have held open the possibility that a different standard may apply under the Vermont Constitution. Compare State v. Sullivan, 2013 VT 71, ¶ 38, 194 Vt. 361,  80 A.3d 67 (recognizing that this Court has "previously suggested that the voluntariness of statement for purposes of the Vermont Constitution is a question of fact," but has also recognized that "voluntariness of confessions under the U.S. Constitution is generally de novo" (emphasis omitted)), with Weisler, 2011 VT 96, ¶ 12 n.4 (recognizing erratic standards of review for voluntariness of confessions), In re Robinson, 161 Vt. 550, 554, 641 A.2d 779, 781 (1994) ("While this Court on appeal . . . will defer to the district court's findings of fact that have support in the record, [we] need [not] defer to a determination of voluntariness in which the district court incorrectly applied the law to the facts."), and State v. Beckley, 157 Vt. 446, 450, 600 A.2d 294, 296 (1991) ("We will uphold a trial court's ruling on the voluntariness of a confession unless that conclusion is unsupported by the evidence or is clearly erroneous.").

is "factual in nature" and subject to clear error analysis). We need not resolve the standard of review for determining a knowing and intelligent waiver in this case because we would affirm the trial court's determination under either standard. Cf. Sullivan, 2013 VT 71, ¶ 39 (declining to address divergent holdings regarding whether voluntariness is question of fact or law under Article 10 of the Vermont Constitution because Court would affirm trial court's decision under either standard).

¶ 25. Defendant argues that the State failed to prove that defendant's initial waiver of his privilege against self-incrimination was knowing and voluntary. Relying heavily on his expert's testimony below, defendant points to his below-average mental capacity, the fact that he was summoned to the police barracks through a ruse, the unorthodox swearing ceremony that accompanied the warnings, the trooper's description of the warnings as "formalities," and the casual conversation about smartphones that immediately followed the warnings to argue that the State failed to prove that he validly waived his Miranda rights. Among other things, defendant asserts that there is nothing in the record to support a finding that he knew that the warnings were given because he was about to be asked questions about the murder.

¶ 26. As to the circumstances surrounding the warnings, the trial court made extensive findings that are supported by the evidence to support its conclusion that defendant understood the warnings. The court found that defendant was "quite observant and responsive to the conversational flow and had a better grasp of police procedure than might be expected"; that defendant had a pragmatic understanding of the legal implications of speaking with the police; that the troopers paused immediately before the warnings and between each one to give more emphasis; that upon learning that defendant did not read well they read the warnings aloud while defendant read along. The court noted that defendant's comments regarding the Blackberry resulted from Detective Baxter taking out his cell phone to note the time. The trial court acknowledged that some of the troopers' actions were "more than a little strange" in relation to expected police

14

practice, but concluded that there was nothing actually misleading in the exchange in light of the very clear and unequivocal language of the warnings themselves, which were very deliberately read to defendant. With respect to defendant's intelligence and capacity to understand, the trial court found:

> [Defendant's] demonstration of general knowledge quite solid. He spoke clearly about auto mechanics and welding. He understood military time, he was aware that the Burger King [he and his wife] drove through would have cameras with which police could cross-check his statements, and said he did watch police shows. His prosody was good, his language was quite detailed, and he was generally forthcoming with information, except where he was apparently struggling to avoid incriminating himself or his wife.

Contrary to defendant's assertion, the trial court adequately reviewed the record to ensure defendant understood his rights.

¶ 27. The court rejected defendant's expert's opinion that, at least up until the time of the Miranda warning, defendant believed he was at the station to talk about the identity theft issue. The court noted that Detective Baxter told defendant what he wanted to talk about, defendant was acutely aware from his interaction with the police the preceding day why they were interested in him, and that the questioning immediately prior to and following the warnings and "swearing ceremony" related to defendant's whereabouts during the time frame of the homicide.

¶ 28. The court also concluded that the trooper's use of the term "formalities" to describe defendant's constitutional rights was not proper, but did not render the warnings invalid in light of the trooper's clear statement of defendant's rights and defendant's indications that he understood and waived those rights.

¶ 29. We conclude that the trial court's findings are well supported by the record. The interview transcript and audio recording support the trial court's findings that defendant followed the conversation, understood the nature of the interview, and knowingly and intelligently waived his rights. Defendant's argument that there is no evidence that he knew the warnings were given

15

because the troopers were going to question him about the homicide is not supported by the record. By the time the troopers administered the Miranda warnings, they had been questioning defendant for well over an hour about his whereabouts on the day and night that the victim went missing, and the "swearing ceremony" that accompanied the warnings was clearly focused on defendant's statement about that timeline. The troopers' questions following this warning likewise focused on the same subject. This evidence is more than sufficient to support the trial court's conclusion.

¶ 30. Finally, like the trial court, we do not approve of describing the constitutional requirement embodied in Miranda as a "formality." But the trial court's conclusion that the trooper's word choice did not undermine the validity of defendant's waiver is supported by the record. We have so held in a very similar circumstance. See State v. Bacon, 163 Vt. 279, 295, 658 A.2d 54, 65 (1995) (disapproving of officer's description of Miranda rights as "technicalities," but finding this term did not render reading of rights "equivocal" where rights were read to defendant and were stated in plain language); see also United States v. Syslo, 303 F.3d 860, 866 (8th Cir. 2002) (holding that officers' description of warnings as "a formality" did not render Miranda waivers invalid); Commonwealth v. Gaboriault, 785 N.E.2d 691, 696-97 (Mass. 2003) (holding that officers' description of Miranda warnings as "a formality" did not render defendant's waiver invalid where defendant "was read his Miranda warnings three times, and after all three readings, indicated a willingness to speak with the officers").

### B. Failure to Renew Miranda Warnings

¶ 31. Defendant next contends that the time lapse between his initial Miranda warnings and the more pointed questioning that led to his confession was so long as to render the initial warnings stale, therefore requiring the officers to readminister them.

¶ 32. The U.S. Supreme Court has mandated that in deciding whether fresh Miranda warnings are required after a period of time has elapsed between the initial warning and an inculpatory statement, a court must consider the totality of the circumstances. Wyrick v. Fields,

459 U.S. 42, 48-49 (1982) (per curiam) (rejecting per se rule requiring police to readvise suspect of his rights before questioning him about results of polygraph examination and emphasizing whether fresh warnings are needed depends upon totality of circumstances); see also Ex parte Landrum, 57 So.3d 77, 82 (Ala. 2010) ("Whether Miranda warnings should be given before each interrogation must depend upon the circumstances of each case." (quotation omitted)); In re Interest of Miah S., 861 N.W.2d 406, 413 (Neb. 2015) (in reviewing whether fresh Miranda warnings are needed, court considers "the totality of the circumstances"); State v. DeWeese, 582 S.E.2d 786, 798-99 (W.Va. 2003) (same). An initial warning and waiver remains valid, "unless the circumstances change[] so seriously that [the suspect's] answers no longer were voluntary, or unless [the suspect] no longer was making a knowing and intelligent relinquishment or abandonment of his [or her] rights." Wyrick, 459 U.S. at 47 (quotation omitted).

¶ 33.   In considering the totality of the circumstances, courts have identified a number of non-exclusive factors.  For example, in United States v. Pruden, the U.S. Court of Appeals for the Third Circuit stated as follows:

> [T]he question of whether a time lapse renders Miranda warnings "stale" may be reduced to answering two questions: (1) At the time the Miranda warnings were provided, did the defendant know and understand his [or her] rights?  (2) Did anything occur between the warnings and the statement, whether the passage of time or other intervening event, which rendered the defendant unable to consider fully and properly the effect of an exercise or waiver of those rights before making a statement to law enforcement officers?

398 F.3d 241, 246-47 (3d Cir. 2005) (quoting United States v. Vasquez, 889 F.Supp. 171, 177 (M.D.Pa. 1995)).  Other courts have followed the North Carolina Supreme Court in advising trial courts to consider five non-exclusive factors:

> (1) the length of time between the giving of the first warnings and the subsequent interrogation; (2) whether the warnings and the subsequent interrogation were given in the same or different places; (3) whether the warnings were given and the subsequent interrogation conducted by the same or different officers; (4) the extent to which the subsequent statements differed from any

17

previous statements; (5) the apparent intellectual and emotional state of the suspect.

State v. McZorn, 219 S.E.2d 201, 212 (N.C. 1975) (citations omitted) vacated in part on separate ground by McZorn v. North Carolina, 428 U.S. 904 (1976); see In re Interest of Miah S., 861 N.W.2d at 413 (adopting North Carolina approach); In re Kevin K., 7 A.3d 898, 908 (Conn. 2010) (same). We find these two approaches helpful, though emphasize that whether fresh Miranda warnings are required depends on the totality of the circumstances and that these approaches are used simply to provide some guidance in conducting that analysis.[4]

¶ 34. Looking to the totality of the circumstances, the trial court concluded that the initial Miranda warnings were not stale by the time defendant confessed. As the trial court found, although the interview lasted several hours and included a trip to various areas where different criminal acts occurred, overall, it found that the interrogation was "a cohesive whole." Indeed, there was no "intervening event . . . , [and] the interview did not cease until the point [defendant] was arrested and formally taken into custody at the very conclusion of the seven-hour interview." As the trial court explained, "[a]t all relevant times during the questioning immediately before and after the Miranda warnings, excepting the very initial period when Lieutenant Nally feigned interest in [defendant's] statements regarding the identity theft issue, the topic never wavered from the troopers' interest in [defendant's] information regarding the [victim's] murder investigation."

¶ 35. The trial court's factual findings on this point are supported by the record, and its conclusion comports with the law. See Commonwealth v. Scott, 752 A.2d 871, 876 (Pa. 2000) ("[W]here there is a time lapse of several hours, the accused is not moved, and there is a clear

---

[4] Our standard of review on the issue of staleness has not been established. Some courts appear to employ a deferential standard of review to the factual findings of the trial court, but plenary review as to whether those findings support the conclusion that the Miranda warnings had grown stale. See United States v. Ferrer-Montoya, 483 F.3d 565, 569-70 (8th Cir. 2007) (applying clear-error review to trial court's factual findings, but reviewing issue of staleness de novo); People v. Degorski, 886 N.E.2d 1070, 1078 (Ill. Ct. App. 2008). Because we would affirm under either standard, we need not determine which applies. See supra ¶ 23 n.2.

continuity of interrogation interrupted only by a lapse of time, there is no need for repeated warnings before the second interrogation." (quotation and emphasis omitted)); State v. Frazier, 622 N.W.2d 246, 254-55 (S.D. 2001) (holding defendant not entitled to fresh Miranda warnings where, under totality of circumstances, "there was a clear continuity of interrogation"); People v. Garcia, 651 N.E.2d 100, 108 (Ill. 1995) (holding fresh Miranda warnings not required after passage of several hours, and reasoning "[t]his commonsense approach avoids the otherwise ridiculous situation of police officers having to issue Miranda warnings prior to each question or after every break in the questioning"). On this record, the one-hour delay between when the Miranda warnings were administered and the more pointed questions leading to defendant's confession did not require fresh Miranda warnings. See In re Interest of Miah S., 861 N.W.2d at 412-413 (noting other courts holding readvisement of Miranda warnings not necessary after "5 hours, 17 hours, 2 days, 3 days, and all the way up to a week or more if law enforcement asks if the suspect remembers his or her rights."); but see id. at 412 (noting other courts have required readvisement after "4 hours, 18 hours, 2 days, and 3 days"). In this case, not only was the subject of the interview consistent between the time of the warnings and defendant's confession, but the warnings were given in the same room as the subsequent interrogation, by the same officers who had been and were continuing to interview defendant.

¶ 36. Accordingly, we affirm the trial court's conclusion that based on the totality of the circumstances, defendant was not entitled to fresh Miranda warnings prior to his confession.

### C. Voluntariness of Confession

¶ 37. Defendant's final argument is that the trial court improperly found his confession was voluntary. He argues that the ruse used to get him to come to the police barracks, interview techniques such as implied promises of leniency, and his own low IQ and lack of prior experience with police led to an involuntary confession. We disagree.

19

¶ 38. Generally, in order for a confession to be admissible, it must be voluntarily given by defendant. See State v. Zehner, 142 Vt. 251, 253, 453 A.2d 1126, 1127 (1982) ("A criminal defendant is denied due process of law if [a] conviction is founded in whole or in part upon an involuntary confession regardless of its truth or falsity." (quotation omitted)).

¶ 39. A confession is voluntary if it is "the product of a free and deliberate choice rather than coercion or improper inducement." Brooks, 2013 VT 27, ¶ 23 (quotation omitted). While "it is generally recognized that the police may use some psychological tactics in eliciting a statement from a suspect," Bacon, 163 Vt. at 294, 658 A.2d at 64 (quotation omitted), the critical inquiry is "whether the interrogation was so coercive as to undermine defendant's ability to voluntarily waive his [or her] rights." Brooks, 2013 VT 27, ¶ 23 (quotation and emphasis omitted). To determine the voluntariness of defendant's confession, the trial court is required to examine the totality of the circumstances. State v. Roberts, 160 Vt. 385, 388, 631 A.2d 835, 837 (1993). We recently concluded that a confession was involuntary where police made inappropriate promises of leniency, coupled with a misrepresentation of their authority to bring about that lenient treatment. Reynolds, 2016 VT 43, ¶ 15. Although the State's compliance with Miranda does not conclusively establish the voluntariness of a subsequent confession, "cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare." Berkemer v. McCarty, 468 U.S. 420, 433 n.20 (1984).[5]

¶ 40. Here, the trial court's findings of fact, which are supported by substantial evidence, support the conclusion that defendant gave a voluntary confession. First and foremost, defendant knowingly and intelligently waived his right to remain silent after the troopers read him the

---

[5] As noted above, although we defer to the trial court's findings of historical fact unless they are clearly erroneous, our review of the legal question of voluntariness is plenary. See supra ¶ 23.

Miranda warnings. As noted above, it is a rare case in which a defendant can make a colorable claim that an incriminating statement was compelled notwithstanding a knowing, intelligent, and voluntary waiver of Miranda rights. Second, defendant's statements throughout the interview reflect his understanding of his situation. See supra, ¶ 26. Third, the record does not reflect any improper promises like those in Reynolds. Fourth, defendant was resistant to some of the interrogation tactics, undermining defendant's claim that his confession was involuntary. For example, the trial court noted an instance in which defendant pushed back against the troopers' attempt to shift blame to the victim by suggesting that she had treated defendant badly. Defendant reacted by bluntly asserting that the victim was "not demeaning toward[s] [defendant] but rather was nice." Fifth, defendant made repeated demands for additional evidence to inform his calculus of his own self-interest. Sixth, the officers did not attempt to "sweat" out defendant, but rather provided him with "water, soda, bathroom breaks, and on multiple occasions [] asked if he wanted to continue, to which [defendant] responded he would." Finally, the trial court held that the troopers never crossed the line from "being confrontational into being coercive." In, fact, as defendant was drawing nearer to confession, his "analysis of his self-interest became evident in his language."

¶ 41. The fact that defendant was initially lured to the barracks through a ruse does not undermine our conclusion that his confession was voluntary. He had multiple opportunities after Detective Baxter arrived and asked to speak to him in connection with the homicide investigation to terminate the interview, and the troopers gave him Miranda warnings, emphasizing his right to not speak, during that time. For these reasons, we affirm the trial court's conclusion that defendant's confession was voluntary.

II. Exclusion of Dr. Kinsler's Testimony

¶ 42. During his interview, defendant stated that he and his wife, Patricia Prue, had in the past engaged in three-way sex, that on the night of the homicide they wanted find a girl to "play

21

with" sexually, that his wife had made the phone call that lured the victim to a deserted area, that his wife was present when the victim arrived and defendant strangled her, and that he and his wife had taken various steps together to conceal the victim's remains. The State charged defendant's wife separately with various crimes as a result of her role in the kidnapping and murder. Because the discovery schedule in her case was extended to allow her to explore an insanity defense, defendant's case approached trial first.

¶ 43. The expert disclosure deadline in defendant's case was April 1, 2014. In June 2014, in defendant's wife's case, counsel disclosed to the State a report generated by Dr. Philip Kinsler, a psychiatrist who had been reviewing voluminous material concerning defendant's wife for months and had interviewed her for more than thirty hours. Upon receiving a copy of the report in defendant's wife's case, the State forwarded the report to defendant's attorney as part of what it considered its ongoing obligation to provide discovery. In July 2014, defense counsel noticed the State that he might call Dr. Kinsler as an expert witness in defendant's case. The trial in defendant's case was scheduled for October.

¶ 44. Defendant sought to elicit from Dr. Kinsler his diagnosis about Mrs. Prue and the information he reviewed in order to reach that diagnosis, including her extensive mental health history, exclusive of any discussion of the events underlying the charges. Dr. Kinsler's opinion was that defendant's wife suffered from dissociative identity disorder ("DID") and that one of her alters is homicidal. The defense theory was that defendant's wife committed the murder in a violent and explosive way, and that this expert testimony would provide the jury insight to support this view. Defendant's theory was bolstered by a defense witness who testified that she met defendant's wife while they were both incarcerated, that defendant's wife sometimes acted very giggly and silly and other times very aggressive, and that during an aggressive moment defendant's wife told her that she, and not defendant, killed the victim. In particular, defendant's wife claims

to have grabbed the victim by the hair, pulled her into the car, and strangled her, all the while shouting to her husband, "You want to fuck her now?"

¶ 45. The State moved to exclude Dr. Kinsler's testimony on the grounds that defendant's wife's mental state was not relevant to the question of whether defendant committed the acts alleged. Moreover, the State argued that allowing Dr. Kinsler to testify would be prejudicial because the defense's disclosure of its intention to call Dr. Kinsler was late, and the State's own expert had conducted only part of his own evaluation in response to Dr. Kinsler's report. As a result, the State did not have a fair opportunity to challenge Dr. Kinsler's testimony. Defendant's wife also filed a motion to quash his subpoena of Dr. Kinsler, arguing primarily that Dr. Kinsler was an expert retained by wife, and his opinions were protected by the attorney-client privilege.

¶ 46. The trial court granted the State's motion to exclude. The court noted the late disclosure and discussed the prejudice to the State that admission of the testimony would cause. Because the State had not yet completed its own exam in connection with defendant's wife's insanity defense, and given the controversial nature of the DID diagnosis, allowing Dr. Kinsler to express an opinion that could not be tested would be unfair and prejudicial to the State, and disruptive of the orderly process of the trial. In addition, given the subject matter of Dr. Kinsler's opinion and the general inability to test his opinions regarding the applicability of DID to a specific factual scenario, there was a distinct possibility that introduction of Dr. Kinsler's testimony would create a collateral issue that would confuse the jury.

¶ 47. The trial court further noted that the prejudice to defendant from disallowing Dr. Kinsler's testimony would be minimal—or even the opposite. Dr. Kinsler's diagnosis of defendant's wife's mental condition would be relevant only if Dr. Kinsler related her mental state to the time of the murder; such testimony would likely lead to admission, on direct or cross examination, of information in the report that was unfavorable to defendant. If the defense could pick and choose—relying on the testimony from a fellow inmate that defendant's wife confessed

23

to the killing along with a portion of Dr. Kinsler's testimony—some other story could be woven. But the factual evidence underlying Dr. Kinsler's opinion was "damning to [defendant]."

¶ 48.    On appeal, defendant argues that he was not seeking to have Dr. Kinsler testify about his wife's sanity defense but, rather, was seeking to elicit testimony solely concerning defendant's wife's diagnosis. Because the court misconstrued defendant's argument, it wrongly determined that the State would be prejudiced because it had not completed its examination of defendant's wife's sanity in the context of her case. Defendant argues that the fact that his wife suffers from DID and has an alter that is domineering and homicidal was relevant to his defense.

¶ 49.    We see no evidence that the trial court misunderstood defendant's argument below and conclude that the trial court's determination that the substantial danger of unfair prejudice outweighed the probative value of this evidence was within its discretion.

¶ 50.    In all cases involving evidentiary decisions, "[t]rial courts have great latitude in deciding whether to admit or exclude evidence." State v. Little, 167 Vt. 577, 579, 705 A.2d 177, 180 (1997). Vermont Rule of Evidence 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Generally, the trial court's Rule 403 balancing is not disturbed "absent a showing of an abuse of [] discretion." State v. Webster, 165 Vt. 54, 56, 675 A.2d 1330, 1332 (1996). An abuse of discretion occurs when the trial court "either totally withholds or exercises its discretion on clearly untenable or unreasonable grounds." State v. Russell, 2011 VT 36, ¶ 9, 189 Vt. 632, 22 A.3d 455 (mem.) (quotation omitted).

¶ 51.    On the probative value side of the calculus, the trial court's reasoning was well within its discretion. The court correctly noted that defendant's wife's DID diagnosis was relevant only if linked to her mental state at the time of the murder, and it would accordingly lead to further testimony about Dr. Kinsler's basis for connecting the DID diagnosis to the events at issue in this

24

case. The trial court was well within its discretion in concluding that Dr. Kinsler's basis for making this link, as reflected in his written report, included highly prejudicial and damning evidence against defendant. As the trial court explained, "[w]ithout the ability to relate Dr. Kinsler's version of [defendant's wife's] mental state to the time of the murder, it would not be relevant. If it is related to the time of the murder it is harmful to [defendant]."

¶ 52. With respect to the prejudicial effect of the testimony, the trial court's analysis is likewise sound. The trial court noted that Dr. Kinsler's opinion relied on a controversial diagnosis.[6] The State had not had an opportunity to complete its own extensive evaluation, so the soundness of Dr. Kinsler's opinion could not be tested. Moreover, the court's projection that the testimony would create a collateral issue that would confuse the jury was reasonable under the circumstances. For these reasons, the trial court did not abuse its discretion in disallowing Dr. Kinsler's testimony.

### III. Introduction of Defendant's Wife's Internet Searches

¶ 53. On day eight of the trial, the State called Peter Garivaltis, a sergeant in the Computer Crimes Unit of the Vermont State Police, to testify to the results of an evaluation he performed on a laptop owned by defendant's wife. That evaluation uncovered various searches conducted from the computer in July 2011, including: (1) "xxx how to kidnap a girl"; (2) "ways to kidnap a girl"; (3) "how to kidnap a girl"; (4) "how o [sic] kidnap a girl'"; (5) "how to love"; and (6) "how to rape a girl and not get caught." The State sought to introduce this evidence to provide background concerning defendant and his wife's plan to kidnap and murder the victim. Defendant objected, arguing that defendant's wife's internet searches in the summer of 2011 were not relevant to the charges against defendant because it was defendant's wife, and not defendant,

---

[6] The trial court noted some cases from sister states addressing whether a DID diagnosis can support an insanity defense—an issue not directly relevant to defendant's theory of relevance with respect to the disputed testimony. But the court noted that those cases also demonstrate "the controversial nature of the diagnosis."

who conducted the searches, and the State could not establish the existence of any conspiracy or plan between the parties when these searches were conducted.

¶ 54. The trial court overruled defendant's objection and allowed Garivaltis to testify, reasoning:

> This was a—the fact that it was seven months prior to the event, has relevance, but in this case it's overshadowed by the—by the parallelism between the act, that is the—what the question was—what the criminal act was that was actually alleged to have been committed—as—as alleged to be committed. They're virtually synonymous.
>
> This is not a situation where one actor is being tagged with the—with some other act of an another individual, which is kind of unrelated. This is very, very similar and parallel. I think it's a reasonable inference that the conspiracy was afoot at [the time of the searches].
>
> Can the government prove the exact moment between husband and wife, where the germ of an idea gets discussed? I don't think the government can do it, but I think it's reasonable in this case that whether [defendant] was home or not makes little difference. This is—these are two people who live in the same household, are inseparable, by all evidence, and although this was while [defendant] was still working, so there's a little separation, it's a reasonable inference that this is all part of a conspiracy."

¶ 55. On appeal, defendant argues that: (1) because there was no evidence that the specific plan to kidnap the victim in this case was afoot in the summer of 2011, the trial court incorrectly concluded that defendant's wife's internet searches were relevant; and (2) the probative value of the internet searches was substantially outweighed by the prejudicial effect they would have on the jury. We affirm the trial court's ruling.

¶ 56. Generally, we apply a deferential standard of review to the trial court's evidentiary rulings, and will reverse its decision "only when there has been an abuse of discretion that resulted in prejudice." State v. Desautels, 2006 VT 84, ¶ 12, 180 Vt. 189, 908 A.2d 463. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable that it would be without the evidence."

V.R.E. 401. When determining relevancy, we allow " 'great latitude' " in the admission of " 'circumstantial evidentiary facts . . .' " Reporter's Notes, V.R.E. 401 (quoting State v. Ryder, 80 Vt. 422, 426, 68 A. 652, 654 (1908)).

¶ 57. In concluding that the jury could infer that the couple's conspiracy to kidnap and sexually assault a woman was underway by the summer of 2011, the trial court considered evidence that defendant and his wife were very close and spent almost all of their time together throughout their marriage, as well as the uncanny resonance between the internet searches and defendant's and his wife's ultimate actions. The trial court's assessment was supported by the evidence and within its broad discretion.

¶ 58. With respect to defendant's argument that admission of the internet search evidence was unduly prejudicial, we note that defendant failed to object to the searches on Rule 403 grounds. "An objection on one ground does not preserve an appeal on other grounds." State v. Bubar, 156 Vt. 398, 400, 505 A.2d 1197, 1199 (1985). In addition, where a defendant fails to ask the trial court to balance the probative value of the evidence against prejudicial effect, we need not consider it, see Desautels, 2006 VT 84, ¶ 14, "in the absence of plain error," Bubar, 146 Vt. at 400, 505 A.2d at 1199. Plain error exists "only where a failure to recognize error would result in a miscarriage of justice, or where there is glaring error so grave and serious that it strikes at the very heart of the defendant's constitutional rights." State v. Viens, 2009 VT 64, ¶ 11, 186 Vt. 138, 978 A.2d 37 (quotation omitted). When the error involves prejudicial evidence, "the [defendant] must demonstrate that the judgment was substantially affected by admission of" the prejudicial evidence. Bubar, 146 Vt. at 401, 505 A.2d at 1199. Defendant has not made such a showing in this case, because, as the record reflects, there is substantial independent evidence that defendant and his wife conspired to abduct a woman, including cell phone records, photographs, articles of clothing belonging to defendant found at the crime scene, surveillance recordings of defendant and his wife purchasing the TracFone used to phone the victim, defendant's wife's role in placing the

call to lure the victim on the night of the murder, and defendant's own statements to the police. Even if evidence of the internet searches was more prejudicial than probative, its admission did not constitute plain error.

IV. Defendant's Request to Continue his Sentencing

¶ 59. In December 2014, defendant made several motions to continue the sentencing hearing scheduled for December 17, 2014 so that he could call two witnesses. First, he sought to call Dr. Kinsler as a witness. He argued that for sentencing purposes, evidence about defendant's marriage and his wife's behavior and mental health would be relevant insofar as these facts affected defendant. Defendant did not initially specify why a continuance was required to enable Dr. Kinsler to testify. The State did not object to defendant's calling Dr. Kinsler, but opposed a continuance given the extensive delays throughout the case. The State took the position that Dr. Kinsler could testify at the December 17 hearing, and it would call its own expert, Dr. Linder, who had just completed a report for the State. Defense counsel then argued that he needed more time to fully review the State's own expert's newly released 150-page report to decide whether to press forward with his intention to call Dr. Kinsler. Second, defendant sought to call his wife as a witness. He had just learned that, subject to a competency evaluation, she planned to drop her insanity defense and plead guilty to first degree murder, kidnapping, and conspiracy. That would make her available to testify about her role in the offense and her effect on defendant's life in general.

¶ 60. The trial court denied the motions before the sentencing hearing, and in response to renewed motions at the hearing. With respect to the requested continuance to allow defense counsel more time to review Dr. Linder's report, the court noted that the case was about three years old and declined to change the schedule. The court indicated that if the parties needed more time, he would then schedule another day for the hearing. When defendant renewed the motion at the sentencing hearing, the court questioned the value of the competing expert reports that were

primarily focused on sanity, and noted that there were other mechanisms for getting most of the information the experts would offer in front of the court. The court acknowledged the gravity of the sentence, but concluded that given the age of the case, the court needed to move forward.

¶ 61. As to defendant's wife, the court balanced the competing considerations and ultimately denied defendant's request. The court explained that defendant's wife's availability to testify would be contingent on the results of a competency evaluation, as well as her waiver of her right to automatic appeal. The court could not predict when she would become available to testify. The court also noted that defendant was unable to identify what his wife would say, so the court was not sure that she would actually help defendant. And the court pointed to the substantial amount of evidence already in the presentence investigation report concerning defendant's wife's influence on him and involvement in the events leading to the murder, as well as potential testimony from defendant's mother, who lived with the couple and had much to offer. Although the court acknowledged the gravity of the proposed sentence, in light of the above factors, as well as the age of the case—just short of three years, the court denied the motion.

¶ 62. Defendant challenges these rulings on appeal, arguing that given the gravity of the sentence and the possibility that Dr. Kinsler's or defendant's wife's testimony might have led the court to impose a lesser sentence, the court erred in denying the continuance, and defendant's sentence should be vacated. We affirm the trial court's discretionary ruling.

¶ 63. Rulings on motions to continue are entrusted to the sound discretion of the trial court in light of the surrounding circumstances, and this Court will not interfere with the trial court's decision if there is a reasonable basis to support it. See State v. Schreiner, 2007 VT 138, ¶ 14, 183 Vt. 42, 944 A.2d 250.

¶ 64. With respect to Dr. Kinsler's testimony, we note that the court did not preclude defendant from calling this expert. Defendant elected not to call Dr. Kinsler because defense counsel concluded that the one-week period between the State's disclosure of its own expert's

29

newly completed report and the sentencing hearing did not leave sufficient time to prepare to cross-examine the State's expert. In declining to continue the hearing to enable defense counsel to review Dr. Linder's report more thoroughly, the trial court expressed skepticism about the value of dueling expert testimony that would implicate issues collateral to defendant's sentence when much of the information concerning defendant's relationship with his wife, her influence on him, and her involvement in the crimes was already available through other sources. These observations were supported by the record, and the trial court did not abuse its discretion in concluding that, notwithstanding the gravity of defendant's potential sentence, the value of this testimony did not warrant prolonging an already extremely old case.

¶ 65. Likewise, the trial court's recognition that defendant's wife's plea was still subject to multiple contingencies such that its timing remained unpredictable; that defendant did not know what wife would actually say and whether it would be helpful; and that the presentence investigation report contained the same type of information defendant sought to develop through his wife's testimony was supported by the record. With these considerations in mind, the trial court thoughtfully balanced the gravity of the proceedings and the age of the case in declining to continue the sentencing. Given our standard of review and the facts relied upon by the trial court, we cannot find the trial court abused its discretion in denying defendant's motion to continue his sentencing.

Affirmed.

FOR THE COURT:

_____

Associate Justice

30