NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2021 VT 23

No. 2020-091

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Franklin Unit, |
| | Criminal Division |
| Jeremy Lambert | |
| | December Term, 2020 |

Martin A. Maley, J. (motion to suppress); A. Gregory Rainville, J. (final judgment)

Diane C. Wheeler, Franklin County Deputy State's Attorney, St. Albans, for Plaintiff-Appellee.

Allison N. Fulcher of Martin, Delaney & Ricci Law Group, Barre, for Defendant-Appellant.

PRESENT: Reiber, C.J., Robinson, Eaton, Carroll and Cohen, JJ.

¶ 1. **CARROLL, J.** Defendant Jeremy Lambert appeals his conviction on two counts of sexual assault against a minor, M.M. He argues that the trial court erred in admitting statements he made to police detectives because they failed to read him Miranda warnings and his statements were not given voluntarily. He further argues that the court infringed upon his right to a fair trial and to present a defense when it limited his cross-examination of M.M.'s mother and precluded two witnesses from testifying about statements allegedly made by M.M's mother. Because defendant was not in custody for the purposes of a Miranda warning, gave his statements to the detectives voluntarily, and failed to preserve his evidentiary claims, we affirm.

¶ 2. The record indicates the following. In 2017, defendant and his daughter moved in with his girlfriend and her three children, including fourteen-year-old M.M., in his girlfriend's

home in Enosburgh. They all later moved into defendant's home in Swanton. In August 2017, law enforcement received a complaint from the Department for Children and Families that defendant sexually assaulted M.M. on two occasions.

¶ 3. In August 2017, Detectives Timothy Chagnon and Rick Stepien of the Northwest Unit for Special Investigations (NUSI) went to defendant's workplace to investigate these allegations. At about 12:45 in the afternoon, defendant's supervisor approached him and informed him that two detectives were in the office asking to speak to him. Upon entering the office, the detectives introduced themselves, and Detective Chagnon shook defendant's hand. They asked if there was a place where they could speak with him, and defendant responded "wherever." The detectives' vehicle was parked outside, and they asked defendant if he would be willing to speak there. Defendant agreed.

¶ 4. The three men exited the building and entered the detectives' unmarked service vehicle with the doors shut and windows rolled up. Detective Chagnon was in the driver's seat, defendant was in the front passenger seat, and Detective Stepien was in the back seat. Once inside, Detective Chagnon said to defendant: "[y]ou aren't under arrest, you're free to leave, you don't want to talk to me, you don't have to, but you probably know why we're here." Defendant told them he had no idea why they were there. Detective Chagnon informed defendant that NUSI had received a complaint from M.M. and asked him if he knew what it was about. He told them he did not know.

¶ 5. After inquiring about defendant's relationship with M.M., Detective Chagnon informed defendant that NUSI had received information about "some inappropriate touching between [defendant] and M.M." Defendant immediately denied that any touching occurred. Detective Chagnon asked if defendant had ever been alone with M.M., and defendant responded that he had been alone with her on several occasions to discuss her problematic behavior, which included sending inappropriate images of herself via text message and skipping the last day of

2

school to spend it with a nineteen-year-old male. Defendant told the detectives that, after taking his own daughter to driver's education classes, he would talk to M.M. either at the school or at a "pull-off" near a creek or boat access. He explained that he would go to the pull-off because he wanted to avoid other parents overhearing his conversations with M.M. However, other cars were often present at the pull-off. Defendant told the detectives that on one occasion there was a red pickup truck with an older man inside, and on another, there was a small white sedan parked next to him.

¶ 6. After hearing this, Detective Chagnon falsely stated that the man in the red pickup truck saw defendant take M.M. down a path by the pull-off. Defendant vehemently denied any wrongdoing, admitting that he did go into the woods with M.M., but maintaining that nothing inappropriate occurred. Detective Chagnon continued with a stronger allegation:"[y]ou had her pull her pants down." Defendant replied, "[n]o, I did not." Detective Chagnon asked defendant why he went into the woods with M.M., and he responded that it was only to get out of the vehicle because it was hot that day, swearing that "nothing freaking happened." Defendant explained that he would never do something like that to a child because something similar had happened to him in the past. In an attempt to make it appear he was trying to mitigate defendant's culpability, Detective Chagnon responded that "sometimes the situation, you know, you become a victim, then you victimize someone else. It happens. I've seen it all the time. I've been doing this for 40 years, okay, and I can tell right now, you're not being completely honest." Defendant insisted that he was being honest. Detective Chagnon told defendant that his side of the story had "big discrepancies" and ended the conversation by saying "[w]ell, I don't know what to tell you. I think something happened there." Despite the accusations, defendant continued to insist that nothing inappropriate ever occurred.

¶ 7. Throughout the entire interview, defendant sat next to the unlocked door with nothing obstructing his path to leave. At one point, due to the heat, Detective Chagnon cracked

his door open and told defendant he could do the same to let some air in. When the conversation ended, defendant shook Detective's Chagnon hand and exited the car. The entire interview lasted twenty-one minutes.

¶ 8. A few days later, defendant was charged by information with two counts of engaging in a sexual act while serving in a parental role. See 13 V.S.A. § 3252(e)(2). The affidavit of probable cause, which was written by Detective Chagnon, alleged that on two occasions, defendant took M.M for a drive to talk about her inappropriate behavior and sexually assaulted her. The first incident allegedly occurred at a pull-off along the road. The second occurred somewhere in the woods after defendant dropped his daughter off at driver's education class.

¶ 9. Before trial, defendant filed a motion to suppress the statements he made to the detectives during the interview, arguing that they were obtained in violation of the Vermont and United States Constitutions. He specifically argued that the detectives were required to read him his <u>Miranda</u> rights because he was subjected to custodial interrogation. He also argued that the statements were not given voluntarily. The trial court denied the motion, concluding that (1) defendant was not in custody at the time of the questioning, so a reading of <u>Miranda</u> rights was not warranted, and (2) defendant gave his statements voluntarily because the totality of circumstances showed that the detectives did not create an atmosphere so coercive as to overbear defendant's free will.

¶ 10. A four-day jury trial was held in July 2019. The relevant events are as follows. While defense counsel was cross-examining M.M.'s mother, the following exchange occurred:

> Court: [I]t's 4 o'clock. If you're going to finish with this witness today, we need to get to the central point. So I'd just ask you to move along.
>
> [Attorney]: With respect, I'm going to need to take the time that I feel is necessary Judge, please.
>
> Court: As long—the judge has the ability to limit cross-examination and direct testimony—

4

[Attorney]: I see.

Court: — to those relevant and material points.

[Attorney]: Well, it's unfortunate—and with respect to the Court, but it's the defense attorney that guides—

Court: I hear you—I hear you. And I'll try to be reasonable—

[Attorney]: And I understand (indiscernible).

Court: —but—but this witness has been on the stand a long time.

[Attorney]: Um-hum.

Court: You've conducted extensive cross-examination, and I'm just going to ask you to wrap this up in the next fifteen minutes.

Defense counsel neither made a formal objection during this exchange nor proffered a specific reason why he needed more time. In fact, it appears from the record that defense counsel concluded his cross-examination in less than the fifteen minutes provided.

¶ 11. The next day, defendant's sister testified on his behalf. At one point, defense counsel asked her whether there was "any talk of a deed at [defendant's] home" in her presence. As she began to answer the question, the State objected on relevance grounds. Defense counsel explained that the sister's testimony was relevant because it would show that mother's desire to be put on the deed to defendant's home was thwarted, which could have resulted in animosity towards defendant. The trial court concluded that the testimony was not relevant, explaining that if the "question was asked of Mother it might have been allowed as . . . potential impeachment, but that's not the situation here."

¶ 12. Defense counsel then asked the court if a different witness could testify that she heard the mother say that "if [defendant] splits up with me, I'll make his life a living hell." The State objected, and the following exchange occurred:

[State]: It's—but the motive here goes to [M.M.] not to the mother. And the State believes that [statement] just goes down as confusing.

5

It's not relevant. And it wasn't asked of the mother on direct or cross-examination while she was on the stand.

Court: I—the Court agrees.

. . . .

Court: If the question had been asked and denied by Mom, then that might well be an appropriate question here. But it's not a fact in evidence at this point. And I don't think you can get it in through this witness.

Defense counsel responded "okay" and did not place an objection on the record. At the conclusion of trial, defendant was convicted on both counts of sexual assault.

¶ 13. Pursuant to Vermont Rule of Criminal Procedure 33, defendant filed a motion for a new trial, arguing in part that his right to present a defense was infringed by the trial court's decisions to limit the time for cross-examination of mother and to preclude witness testimony regarding statements allegedly made by mother. The court denied the motion without specifically addressing defendant's argument that his right to present a defense was infringed. Defendant appealed.

¶ 14. On appeal, defendant asserts that the trial court erred in denying his motion to suppress the statements made in the detectives' vehicle and his motion for a new trial. He argues that he was in custody at the time of the questioning—and thus the detectives were required to read him his <u>Miranda</u> rights—and that any statements to them were involuntary. Finally, defendant asserts that the trial court infringed upon his right to a fair trial when it placed time limits on his cross-examination of M.M.'s mother and precluded testimony from two witnesses regarding two statements allegedly made by M.M.'s mother.

¶ 15. Given the totality of the circumstances, we conclude that defendant was not in custody for the purposes of <u>Miranda</u> and that his statements to the detectives were given voluntarily. In addition, because defendant did not object to the trial court's decisions to limit

6

cross-examination and preclude the testimony about mother's two alleged out-of-court statements, we review for plain error and conclude that the trial court did not commit plain error.

## I. Miranda

¶ 16. First, we turn to the issue of whether the detectives were required to give defendant Miranda warnings. Article 10 of the Vermont Constitution and the Fifth Amendment of the United States Constitution, which is applicable to the states via the Fourteenth Amendment, provide a right against self-incrimination in criminal prosecutions. See Vt. Const. ch. I, art. 10; U.S. Const. amend. V; State v. Cox, 147 Vt. 421, 422-23, 519 A.2d 1144, 1145 (1986). "[W]e have consistently held that, in its application to adults, the Article 10 privilege against self-incrimination and that contained in the Fifth Amendment are synonymous." State v. Rheaume, 2004 VT 35, ¶ 18, 176 Vt. 413, 853 A.2d 1259. Federal law therefore governs cases alleging a Miranda violation and, with respect to federal issues, "we are no more than an intermediate court, attempting to apply the supreme law of the land, as pronounced by [the United States Supreme Court]." State v. Muntean, 2010 VT 88, ¶ 16, 189 Vt. 50, 12 A.3d 518 (quotation omitted).

¶ 17. In Miranda v. Arizona, the United States Supreme Court held that before engaging in "custodial interrogation," law enforcement officers must employ "procedural safeguards" to "secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966); accord State v. Sullivan, 2013 VT 71, ¶ 28, 194 Vt. 361, 80 A.3d 67. This means that persons must be warned that they have the right to remain silent, that any statement they make can be used against them, and that they have the right to the presence of an attorney. Miranda, 384 U.S. at 444. Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id.

¶ 18. In determining whether a suspect was in custody, we look for either a formal arrest or "situations approximating 'incommunicado interrogation of individuals in a police-dominated atmosphere.' " State v. Pontbriand, 2005 VT 20, ¶ 11, 178 Vt. 120, 878 A.2d 227 (quoting State

v. Willis, 145 Vt. 459, 475, 494 A.2d 108, 117 (1985)). Absent a formal arrest, we will examine the totality of the circumstances to determine whether there was a "restraint on freedom of movement of the degree associated with a formal arrest." Muntean, 2010 VT 88, ¶ 18 (quotation omitted). The ultimate question is "how a reasonable person in the suspect's position would perceive his or her freedom to leave." Id. (quotation omitted) (alteration omitted). Any subjective belief on behalf of the suspect is accordingly irrelevant. Pontbriand, 2005 VT 20, ¶ 11.

¶ 19. We have identified several factors to use in this custody determination, including: (1) whether the suspect was told he was free to terminate the conversation and leave; (2) the location of the interview; (3) whether the suspect arrived at the interview voluntarily; (4) the interviewer's communication to the suspect of his belief in the suspect's guilt; (5) the extent to which the suspect was confronted with evidence of guilt; (6) whether, and to what degree, the suspect's freedom of movement was restrained; (7) whether law enforcement used any deceptive techniques to conduct the interview; (8) the degree to which the suspect was isolated from the outside world; (9) duration of the interview; (10) whether the officers were armed; and (11) the number of officers present during the interview. Muntean, 2010 VT 88, ¶ 19. However, this list is not exhaustive. Id.

¶ 20. Moreover, the presence of a single factor is not dispositive in determining custody, and each factor need not be considered in every case. Id.; see also, e.g., Stansbury v. California, 511 U.S. 318, 325 (1994) (per curiam) ("Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue . . . ."); State v. Brunell, 150 Vt. 388, 392, 554 A.2d 242, 244 (1988) (concluding that repeated assertions by police that suspect was not under arrest did not outweigh host of other factors in finding custody). Instead, "the court must assess the totality of the relevant circumstances and conclude, given those circumstances, whether a reasonable person would have felt free to terminate the interview and leave." Muntean, 2010 VT 88, ¶ 19.

8

¶ 21.    In reviewing a custody determination on a motion to suppress, we follow a two-step process. Id. ¶ 20. First, we will review the trial court's findings of fact regarding the interview and accept such findings unless clearly erroneous. Id. Second, given those facts, we will consider de novo the legal question of whether a reasonable person would have felt at liberty to leave. Id.; accord Thompson v. Keohane, 516 U.S. 99, 112 (1995) ("Two discrete inquiries are essential to the determination [of custody]: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." (footnote omitted)). A defendant seeking to suppress statements has the burden of showing that he was in custody at the time of the questioning. Pontbriand, 2005 VT 20, ¶ 10.

¶ 22.    In this case, neither party challenges any of the trial court's factual findings. Thus, we need only review the legal issue of whether those factual findings indicate that defendant was in custody. Looking at the totality of circumstances, we hold that defendant has not met his burden of proving that he was in custody at the time of the questioning. Several factors—particularly the fact that defendant was told he was free to leave—lead us to conclude that a reasonable person in defendant's position would have felt free to leave.

¶ 23.    We begin with the first, and most important, factor—whether the suspect was told he was free to terminate the conversation and leave. State v. Hieu Tran, 2012 VT 104, ¶ 14, 193 Vt. 148, 71 A.3d 1201. This factor is pivotal in our analysis because "[a] reasonable person's belief about whether the person is free to leave is necessarily influenced by the communication from police about the extent of the person's freedom." Id. In fact, "custody is usually not found when police assure a defendant that he is not under arrest[] and is free to terminate the questioning and leave." Id.

¶ 24.    Here, the detective explicitly told defendant that he was free to leave. The detective said "[y]ou aren't under arrest, you're free to leave, you don't want to talk to me, you don't have

to, but you probably know why we're here." This statement would unequivocally indicate to a reasonable person that he was free to leave and under no obligation to talk with the detectives. Based on the detective's statement, this factor weighs strongly against a conclusion that defendant was in custody.

¶ 25. The location of the questioning is another important factor in this case. "The location of the interview and the nature of the physical setting where the interview occurred are persuasive factors in the custody calculus . . . for they directly relate to the question of whether a reasonable person would have felt at liberty to terminate the interview and leave." Muntean, 2010 VT 88, ¶ 23. Even though law enforcement vehicles are small, police-operated spaces, questioning that occurs within them is not, in itself, indicative of custody. State v. Sole, 2009 VT 24, ¶ 18, 185 Vt. 504, 974 A.2d 587 ("The mere placement of a person in a law enforcement vehicle does not, in itself, establish custody . . . ." (quotation omitted)); see also Hieu Tran, 2012 VT 104, ¶ 19 ("Questioning of a suspect in a cruiser will not always support a finding of custody.").

¶ 26. In this case, the circumstances surrounding the location of the questioning all indicate a non-custodial environment. First, the detectives did not force defendant to speak with them in their vehicle. When the detectives asked defendant if there was a place they could speak, it was only after he responded with "wherever" that they suggested speaking with him in their service vehicle. Compare Hieu Tran, 2012 VT 104, ¶ 19 (concluding that defendant was in custody in part because police deliberately chose to conduct interview in their vehicle), with State v. Comes, 144 Vt. 103, 107, 472 A.2d 1253, 1255 (1984) (explaining that defendant was not in custody in part because he voluntarily agreed to talk with police in their vehicle after standing outside on cold day). Second, although defendant was taken out of his workplace, the questioning took place in the parking lot—a public space—and was visible to others through the windows and open doors of the car. Cf. Muntean, 2010 VT 88, ¶ 24 (explaining that physical setting of questioning was custodial because it took place in small, windowless room in secure part of police

barracks). Third, the detectives sat in close proximity to defendant—both beside and behind him—but neither obstructed defendant's door nor made an attempt to prevent him from leaving. Rather, the detectives allowed defendant to sit in the front of the vehicle, left the doors unlocked, and, at one point, directly told him he could open the door to get some fresh air. Compare Pontbriand, 2005 VT 20, ¶ 16 (holding that suspect was not in custody when two officers questioned him in his hospital room and made no attempt to block door or prevent medical technicians from entering or exiting), with Sole, 2009 VT 24, ¶¶ 18-19 (concluding that in-cruiser questioning was custodial in part because officer told suspect he could not leave vehicle until officer investigated suspected criminal activity). Altogether, this factor weighs against a conclusion that defendant was in custody.

¶ 27. The next prominent factor in this case is the extent that the detectives communicated to defendant their belief that he was guilty. "While the subjective beliefs of the police are irrelevant by themselves, they may become relevant when they are communicated to the defendant and affect an objective determination of whether the defendant would feel free to leave." Muntean, 2010 VT 88, ¶ 28. A reasonable person typically would not feel at liberty to leave an interview if she was presented with "evidence of guilt for a serious crime and told by the detective that he was convinced of [her] guilt." Id. ¶ 29; see also Miranda, 384 U.S. at 455 ("The aura of confidence in his guilt undermines his will to resist."). "[A] reasonable person understands that the police ordinarily will not set a suspect free when there is evidence strongly suggesting that the person is guilty of a serious crime." Muntean, 2010 VT 88, ¶ 28 (quotation omitted).

¶ 28. Here, the detective made multiple statements indicating that he believed defendant was guilty, including: "you probably know why we're here"; "[y]ou had her pull her pants down"; "I think something happened here"; and "I can tell right now, you're not being completely honest." We conclude for several reasons, however, that these statements are not enough to indicate that defendant was in custody.

11

¶ 29.    First, the detectives' statements were mere accusations. They presented no actual evidence of defendant's guilt. Cf. Hieu Tran, 2012 VT 104, ¶ 15 ("[T]he content of the questioning created a custodial atmosphere because throughout the interview the detectives repeatedly confronted defendant with evidence of his guilt." (emphasis added)); Muntean, 2010 VT 88, ¶ 28 (explaining that "defendant was confronted almost immediately" with evidence of guilt, including that his "daughters and grandsons had independently alleged that defendant had sexually abused them" (quotation marks omitted)).

¶ 30.    Second, defendant maintained his innocence throughout the entire interview and never confessed to the crimes alleged. Confessions are relevant to custody because they relate to "whether a reasonable person would believe he or she was free to leave." State v. Oney, 2009 VT 116, ¶ 14, 187 Vt. 56, 989 A.2d 995; see also Muntean, 2010 VT 88, ¶ 28 (acknowledging that confession to serious criminal act is significant for custody determination). Here, although the detectives repeatedly accused defendant of engaging in a serious criminal act, he maintained his innocence throughout the entire interview, insisting that nothing inappropriate occurred and that he "would not do that to a child." He only admitted to walking with M.M. in the woods—nothing more. A reasonable person maintaining their innocence after being presented with mere accusations of guilt would still feel at liberty to leave.

¶ 31.    Defendant further argues that he was in custody because the detectives used deceptive techniques throughout the interview. "Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (per curiam). Accordingly, deception, like the other factors, is only relevant to the extent "it relates to a reasonable person's perception of his freedom to depart." United States v. Laurita, 821 F.3d 1020, 1026 (8th Cir. 2016); see also Muntean, 2010 VT 88, ¶ 19 (listing factors for determining custody—including use of deception—

12

but reaffirming that court must use those factors to assess "whether a reasonable person would have felt free to terminate the interview and leave").

¶ 32.    Here, the detective falsely told defendant that a man witnessed him and M.M. walking into the woods.  This false statement is not the sort of deceptive technique that would lead a reasonable person to believe he was no longer free to leave.  See Mathiason, 429 U.S. at 495 (explaining that officer's false claim of finding suspect's fingerprints at crime scene had "nothing to do with whether [suspect] was in custody for purposes of the Miranda rule"); Laurita, 821 F.3d at 1026 ("We have consistently concluded that methods which more closely resemble 'strong arm tactics,' . . . such as accusing a suspect of lying or officers' use of a raised voice, have little bearing on whether a suspect would have felt free to terminate an interview.").

¶ 33.    Finally, the length of questioning and any subsequent arrest are also significant factors in this analysis.  See Hieu Tran, 2012 VT 104, ¶¶ 12, 15, 17; see also United States v. Griffin, 922 F.2d 1343, 1355 (8th Cir. 1990) (explaining that arrest at termination of interview is "objective evidence which tends to support the reasonableness of [defendant's] subjective belief that he was in custody from the inception of the encounter and that his arrest was imminent").  The entire interview process occurred over the course of just twenty-one minutes, with defendant leaving freely afterward.  This does not support the argument that defendant was in custody.  Compare Mathiason, 429 U.S. at 495 (holding that suspect was not in custody in part because interview was half an hour and suspect left without hindrance), with Hieu Tran, 2012 VT 104, ¶¶ 1, 17 (concluding that hour-long interview was indicative of custody).

¶ 34.    In sum, looking at the totality of circumstances, we conclude that defendant has not met his burden of proving that he was in custody at the time of the questioning.  The factors discussed above—particularly that the detective told defendant he was free to leave—indicate that a reasonable person in defendant's situation would have felt at liberty to end the interview.  The accusations of guilt and the detective's false statements are not enough, by themselves or under

13

the totality of circumstances, to establish custody. Because defendant was not in custody throughout the questioning, he was not entitled to <u>Miranda</u> warnings.

## II. Voluntariness

¶ 35. Defendant contends that even if the detectives were not required to give <u>Miranda</u> warnings, his statements during this interview were inadmissible because they were not given voluntarily. The trial court concluded that the statements were all voluntary because there was no indication that the detectives' questioning created an atmosphere coercive enough to overbear defendant's free will. Defendant argues that the trial court erred because the detectives' use of deceptive techniques and mitigation tactics induced him to give statements against his will. We disagree.

¶ 36. Both the United States and Vermont Constitutions prohibit the admission of involuntary statements, regardless of the defendant's custodial status. <u>Pontbriand</u>, 2005 VT 20, ¶ 22 ("In addition to the Fifth Amendment's prohibition against self-incrimination, the Due Process Clause of the Fourteenth Amendment prevents admission of involuntary statements into evidence . . . ."); <u>Sullivan</u>, 2013 VT 71, ¶ 37 ("We have held that Article 10 [of the Vermont Constitution] prohibits the taking and using of involuntary statements."). "When a defendant challenges the admissibility of a statement [on voluntariness grounds], the prosecution must prove by a preponderance of the evidence that the statements were voluntary, that is, they were the product of a rational intellect and the unfettered exercise of free will." <u>Sullivan</u>, 2013 VT 71, ¶ 37 (quotation omitted).

¶ 37. A statement is involuntary "if coercive governmental conduct played a significant role in inducing the statement." <u>Pontbriand</u>, 2005 VT 20, ¶ 21. Examples of coercive governmental conduct include "threats, improper influence, [and] physical or psychological pressure." <u>Sullivan</u>, 2013 VT 71, ¶ 37 (quotation omitted). The ultimate inquiry is "whether, under the totality of the circumstances . . . , the suspect's will was overborne by the police." <u>Id</u>.

14

(quotation omitted) (alteration in original). When examining the totality of the circumstances, "both the characteristics of the accused and the details of the interrogation" are relevant. State v. Reynolds, 2016 VT 43, ¶ 13, 201 Vt. 574, 145 A.3d 1256 (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)). Some factors we have taken into account include the youth of the accused, his level of education, his level of intelligence, the extent the accused was advised of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment, such as the deprivation of food or sleep. Id. ¶ 13. We review the underlying findings of fact for clear error and review the legal question of voluntariness de novo.* Id. ¶ 14; Sullivan, 2013 VT 71, ¶ 38.

¶ 38. The trial court found that the prosecution had successfully shown, by a preponderance of the evidence, that defendant's statements were given voluntarily. It found that defendant's characteristics did not indicate a high susceptibility to coercion, and that the detectives' psychological tactics did not overbear defendant's free will. Defendant argues that the trial court erred because his lack of experience with police, coupled with the detectives' psychological tactics, indicate that his statements were induced against his will. Defendant asserts that the detectives used two psychological tactics to overcome his will: (1) lessening the severity of the offense to persuade him to speak with them, and (2) lying about the man in the red truck witnessing defendant walking into the woods with M.M. Given the totality of circumstances, we

---

* In this case, the trial court cited both the Vermont and United States Constitutions in concluding that defendant's statements to the detectives were voluntary. While we have recognized that voluntariness is a question of law under the United States Constitution, we have held open the possibility that voluntariness may be a question of fact reviewed for clear error under the Vermont Constitution. State v. Prue, 2016 VT 98, ¶ 23 n.3, 203 Vt. 123, 153 A.3d 551. We need not decide here whether a different standard may apply under the Vermont Constitution, however, because neither party argues a different standard should apply. In any event, because we affirm under a de novo standard, we would affirm applying the more deferential clear-error standard. See Sullivan, 2013 VT 71, ¶ 39 (affirming under either de novo or clear-error review).

agree with the trial court and conclude that defendant's statements to the police were given voluntarily.

¶ 39. The "characteristics of the accused," including "prior experience with the legal process," is certainly a relevant factor in the voluntariness inquiry. Reynolds, 2016 VT 43, ¶ 13. Although defendant argues he has a heightened susceptibility to coercion because he has very little experience dealing with law enforcement, the trial court found that he had previously been subjected to police questioning by law enforcement for a sex crime. He neither argues that the trial court's finding was clearly erroneous nor elaborates on how his alleged lack of experience impacts his susceptibility to coercion. We accordingly conclude that defendant did not have a heightened susceptibility to coercion.

¶ 40. Moreover, the detectives' psychological tactics—namely, lessening the severity of the offense and lying about the man in the truck—did not overbear defendant's free will. "[I]t is generally recognized that the police may use some psychological tactics in eliciting a statement from a suspect." State v. Bacon, 163 Vt. 279, 293, 658 A.2d 54, 64 (1995) (alteration in original) (quotation omitted). And "[e]ven where such tactics have an impact on a suspect's decision to talk to the police, the resulting statements are voluntary so long as they reflect a product of the suspect's own balancing of competing considerations." Pontbriand, 2005 VT 20, ¶ 22 (quotation omitted). Psychological tactics only become illegally coercive when they are "so manipulative or coercive that they deprive[] [a defendant] of his ability to make an unconstrained, autonomous decision." Bacon, 163 Vt. at 294, 658 A.2d at 64 (alteration in original).

¶ 41. The mitigation tactics employed by Detective Chagnon—namely, telling defendant that he was not a malicious person and that victims of sexual assault often become abusive themselves—are the kind of "soft techniques" that do not render statements involuntary. Pontbriand, 2005 VT 20, ¶¶ 25-27 (explaining that "conveying a supportive attitude" is a "soft technique" that does not render confession involuntary). The detectives did not threaten adverse

16

consequences or imply that cooperation would result in leniency. See id. ¶ 27 (emphasizing that psychological pressure becomes impermissibly coercive when there are "threatened adverse consequences—like the threat of physical harm or repercussions against family members"); see also Reynolds, 2016 VT 43, ¶ 20 (concluding that police officer's statements impermissibly "implied that the defendant's cooperation would 'result in leniency' ").

¶ 42. Similarly, while the detective lied about the man in the red truck seeing defendant walk into the woods, "lies about incriminating evidence, taken alone, are not enough to make any resulting confession involuntary." State v. Kolts, 2018 VT 131, ¶ 24, 209 Vt. 351, 205 A.3d 504. This is especially the case here, where the defendant responded to the lie by maintaining his innocence, explaining that he did go into the woods but that nothing happened. See Sullivan, 2013 VT 71, ¶ 40 (concluding that suspect's statements about drinking were voluntary in part because of "her persistent refusal to take either a field sobriety test or an evidentiary test").

¶ 43. In sum, we conclude that neither the mitigation tactics nor the lie overbore defendant's free will. Considering the totality of the circumstances, including defendant's prior experience with law enforcement and his assertions of innocence, we hold that defendant's statements were given voluntarily.

### III. Evidentiary Issues

¶ 44. Defendant next argues that the trial court violated his Sixth Amendment right to confront witnesses and present a defense when it limited his cross-examination of M.M.'s mother and precluded testimony from two witnesses about out-of-court statements allegedly made by mother that would have shown animus. However, defendant failed to preserve these issues for appeal, and the trial court did not commit plain error.

### A. Preservation

¶ 45. As a threshold matter, defendant failed to preserve any of his evidentiary arguments and, as such, we will not reverse the trial court's decision absent a showing of plain error. To

preserve an issue for appeal, "[a] defendant must specifically raise [the] issue with the trial court." State v. Sharrow, 2008 VT 24, ¶ 21, 183 Vt. 306, 949 A.2d 428. "The purpose behind the preservation rule is to ensure that the original forum is given an opportunity to rule on an issue prior to our review." State v. Shippee, 2003 VT 106, ¶ 34, 176 Vt. 542, 839 A.2d 566 (mem.) (quotation omitted). "When an issue has been forfeited through a party's failure to raise it below . . . we may consider it only under the rubric of plain error." State v. Yoh, 2006 VT 49A, ¶ 36, 180 Vt. 317, 910 A.2d 853; see also State v. Kandzior, 2020 VT 37, ¶ 21, ___ Vt. ___, 236 A.3d 181 ("[A] defendant may not gamble on a favorable verdict before urging prejudicial conduct as grounds for a mistrial.").

¶ 46. Here, defendant failed to preserve his challenges to the trial court's evidentiary decisions. As it pertains to cross-examination of M.M.'s mother, when the court asked defense counsel to move along because the mother had been on the stand for a long time, counsel stated that he was going to take the time that he felt was necessary. In response, the court explained that it had the "ability to limit cross-examination and direct testimony" and asked defense counsel to "wrap this up in the next fifteen minutes." Counsel said that he understood, did not object, and finished his cross-examination of mother without interruption from the court. See Varnum v. Varnum, 155 Vt. 376, 390-91, 586 A.2d 1107, 1115 (1990) (holding that defendant failed to preserve challenge to trial court's decision to limit cross-examination because she "failed to make a timely objection to the time limit and failed to make an offer of proof when her cross-examination was terminated by the expiration of the extended time").

¶ 47. Defendant also failed to preserve his challenge to the trial court's decision to exclude testimony from the two witnesses about mother's alleged out-of-court statements. On the second day of trial, defense counsel asked defendant's sister whether there was "any talk of a deed at [defendant's] home" in her presence. The State objected on relevance grounds. When the trial court concluded that the testimony was not relevant, defense counsel did not object. Instead,

18

defense counsel asked about whether a different witness could testify that she heard mother say that "if defendant splits up with me, I will make his life a living hell." After the court concluded the statement was not admissible, defense counsel said, "Okay," and did not object. Because defendant did not object to either decision, he failed to preserve his challenge to the trial court's decision to exclude the two statements. See Sharrow, 2008 VT 24, ¶ 21 (holding that defendant failed to preserve challenge to exclusion of evidence when he "did not object when the court prohibited him from eliciting testimony").

¶ 48. Because defendant did not preserve his evidentiary challenges, we review for plain error. "Plain-error analysis requires us to consider whether these are exceptional circumstances where a failure to recognize error would result in a miscarriage of justice, or where there is glaring error so grave and serious that it strikes at the very heart of the defendant's constitutional rights." Yoh, 2006 VT 49A, ¶ 39. We have often used the "more concrete federal plain-error test" as a guide in "applying our plain-error standard." Id. ¶¶ 39-40 (citing United States v. Olano, 507 U.S. 725, 734 (1993)). Under this test, plain error occurs "only when: (1) there was an error; (2) the error is obvious; (3) the error affects substantial rights and results in prejudice to defendant; and (4) the error seriously undermines the fairness, integrity, or public reputation of judicial proceedings." State v. Mead, 2012 VT 36, ¶ 27, 192 Vt. 1, 54 A.3d 485.

B. Limitation of Mother's Cross-Examination

¶ 49. Defendant contends that the trial court infringed upon his right to confrontation when it asked defense counsel to wrap up his cross-examination of mother. The trial court informed defense counsel that it had the "ability to limit cross-examination," and that because counsel had already "conducted extensive cross-examination," the court would ask him to "wrap this up in the next fifteen minutes." The trial court did not err, never mind commit plain error.

¶ 50. The trial court maintains a wide latitude in imposing reasonable limits on cross-examination. State v. Cartee, 161 Vt. 73, 77, 632 A.2d 1108, 1111 (1993). Under the Vermont

19

Rules of Evidence, "[t]he court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation orderly and effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." V.R.E. 611(a). "In criminal cases, however, the broad discretion of the trial court in evidentiary matters is limited by defendant's constitutional right to confront witnesses against him and by the demands of due process." In re A.B., 170 Vt. 535, 536, 740 A.2d 367, 369 (1999) (mem.) (quotation omitted).

¶ 51. Given the right to confront, "the court may control the exercise of [cross-examination] to any extent that does not infringe the right itself." Glass v. Bosworth, 113 Vt. 303, 306, 34 A.2d 113, 115 (1943). "Cross-examination satisfies the Sixth Amendment[] guarantee if the defendant is allowed the opportunity to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witnesses." State v. Robitille, 2019 VT 36, ¶ 18, 210 Vt. 202, 213 A.3d 437 (quotation omitted). Once this minimum has been met, a trial court may impose "reasonable limits on cross-examination." Cartee, 161 Vt. at 77, 632 A.2d at 1111; see also Robitille, 2019 VT 36, ¶ 19 ("[A]lthough the Confrontation Clause guarantees an opportunity for effective cross-examination, it does not guarantee cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (quotation omitted)).

¶ 52. Here, the record indicates that the court did not infringe upon defendant's constitutional right to cross-examine mother. Defense counsel had been questioning mother for quite some time before the court interrupted, and the court simply asked counsel to "move along" and "wrap this up" within fifteen minutes. At trial, defendant did not point to any specific reason why he needed more than the additional fifteen minutes provided, and on appeal, defendant does not point to the evidence defense counsel would have elicited had he been given more time to

20

cross-examine mother. In fact, the record seems to indicate that defense counsel did not even use the full fifteen minutes provided to him. Because the court acted within its discretion in setting reasonable limits on cross-examination, there is no error, and therefore no plain error. State v. Herring, 2010 VT 106, ¶ 5, 189 Vt. 211, 19 A.3d 81 ("[W]e will not disturb a reasonable discretionary ruling of the trial court, even if another court might have reached a different conclusion." (quotation omitted)).

## C. Mother's Out-of-Court Statements

¶ 53. Defendant next argues that the trial court infringed upon his right to present a defense because it prevented two witnesses from testifying about statements allegedly made by mother, which would have shown mother had animus towards defendant and a reason to fabricate the daughter's sexual assault allegations. At trial, defense counsel tried to have one witness testify that mother expressed an interest in being placed on the deed to defendant's home and a separate witness testify that she heard mother say that "if [defendant] splits up with me, I will make his life a living hell." The court ruled that both statements were not relevant impeachment evidence because they were not asked of mother in the first instance.

¶ 54. While we disagree with the trial court's analysis, its decision to exclude the two statements did not amount to plain error. The deed statement was relevant and not hearsay, and should have been admitted, but this error is insufficient to meet the plain-error standard because it was not prejudicial to defendant. For the same reason, the trial court's exclusion of the "living hell" statement also fails to rise to plain error, regardless of whether it was hearsay.

¶ 55. In general, "a defendant's constitutional right to present a defense and to confront witnesses limits the trial court's broad discretion to exclude evidence in criminal matters—where the evidence is otherwise relevant and admissible under the rules of evidence." State v. Faham, 2011 VT 55, ¶ 29, 190 Vt. 524, 21 A.3d 701 (mem.). Under the Vermont Rules of Evidence, all relevant evidence is admissible, except as otherwise limited by other evidentiary rules. V.R.E.

402. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." V.R.E. 401. Rule 802 specifies that evidence is not admissible if it contains hearsay, which is defined as an out-of-court statement offered to prove the truth of the matter asserted. V.R.E. 801(c), 802.

¶ 56. Here, defendant argues that both statements were admissible because they were relevant to demonstrate that mother had a motive to lie and fabricate the sexual assault allegations. The statements were therefore not hearsay, defendant submits, because they were being introduced to show bias and motive, not for the truth of the matter asserted. We address each statement in turn.

### 1. Deed Statement

¶ 57. When defense counsel asked defendant's sister whether there was "any talk of a deed at [defendant's] home" in her presence, the State objected on relevance grounds. Defense counsel explained that the question was relevant because it would show that mother's attempts to be put on the deed were thwarted and that, as a result, she harbored animosity towards defendant. The trial court reasoned that the statement could have been used for impeachment if it had been asked of mother and she had denied it. Since mother had not been asked about the statement, the trial court ruled that the statement was not relevant.

¶ 58. This analysis, however, was incorrect. The trial court's conclusion that the statement was only relevant for impeachment rests on an assumption that the statement was otherwise inadmissible hearsay. "The theory behind admitting [out-of-court] statements for impeachment purposes is that a witness's vacillation between two positions is relevant to the witness's credibility, regardless of the information in the inconsistent out-of-court statement." State v. Kelley, 2016 VT 58, ¶ 35, 202 Vt. 174, 148 A.3d 191. By concluding the deed statement

was only relevant for impeachment, the trial court implicitly concluded the information in the statement was inadmissible hearsay and could only be used to attack the mother's credibility.

¶ 59. The statement was not hearsay, however, because defendant intended to use it to show motive. When the State objected to the statement, defense counsel explained that it was relevant to show that mother's desire to be put on the deed were "thwarted," which could "have resulted in some animosity towards" defendant. Because the statement was being introduced to show motive, and not for the truth of the matter asserted—that mother wanted to be put on the deed—it was not hearsay. See V.R.E. 801(c) (defining hearsay as an out-of-court statement "offered in evidence to prove the truth of the matter asserted"); State v. Carter, 164 Vt. 545, 549, 674 A.2d 1258, 1262 (1996) ("Testimony regarding an out-of-court statement that is used not to prove the truth of the matter asserted, but is used instead to rebut an allegation of recent fabrication or improper motive or influence, is not hearsay."). The trial court accordingly erred in ruling that the statement was not admissible.

¶ 60. This error, however, does not rise to plain error because defendant cannot show he suffered prejudice. Yoh, 2006 VT 49A, ¶ 39 (explaining that plain error requires a showing of prejudice). The precluded testimony had very limited probative value because the initial allegation of sexual assault did not come from the mother—it came from the mental health counselor after her meeting with M.M. Because mother is not the source of the allegations, her animosity towards defendant had little probative value.

### 2. Living-Hell Statement

¶ 61. We turn next to the second out-of-court statement, where the witness allegedly heard mother say, "if [defendant] splits up with me, I will make his life a living hell." The trial court ruled that this statement was not relevant for the same reason as the deed statement—because it was not asked of mother prior to the offer, it was not relevant as impeachment evidence.

¶ 62.    Even assuming that this statement was not hearsay, its exclusion is not plain error for the same reasoning set forth above.  A statement made by mother—even one showing direct animosity—is minimally probative absent other evidence to indicate that she reported the assault herself or coached the daughter to report.  Thus, the exclusion of this statement did not rise to plain error, regardless of whether it was hearsay, because it was not prejudicial.

¶ 63.    In sum, the trial court properly limited defendant's cross-examination of mother, and did not commit plain error in excluding both the deed and "living hell" statements.

Affirmed.

FOR THE COURT:

_____

Associate Justice