NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2021 VT 83

No. 2021-013

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Washington Unit, |
| | Criminal Division |
| | |
| Shannon C. Barry | September Term, 2021 |

Mary L. Morrissey, J.

Alfonso Villegas, Washington County Deputy State's Attorney, Barre, for Plaintiff-Appellant.

Matthew Valerio, Defender General, and Dawn Matthews, Appellate Defender, Montpelier, for Defendant-Appellee.


PRESENT: Reiber, C.J., Robinson, Eaton, Carroll and Cohen, JJ.


¶ 1. **EATON, J.** In this interlocutory appeal, the State contests the trial court's order granting defendant Shannon Barry's motion to suppress statements she made to law enforcement officers before her arrest. We conclude that defendant was in custody and had not been advised of her rights under Miranda v. Arizona, 384 U.S. 436, 444 (1966), and therefore affirm the suppression order.

¶ 2. The parties do not dispute the following facts. In June 2019, the Barre City Police Department launched an investigation after Heather Larocque died from taking fentanyl-laced heroin. The investigation involved two officers: Detective Pontbriand to look into the death, and

Corporal Houle to unravel the drug-distribution network implicated in the death. The investigation led the officers to believe defendant sold the fentanyl-laced heroin to Larocque.

¶ 3. Based on this belief, on July 31, 2019, Corporal Houle made efforts to meet and speak with defendant. He first called defendant to request a meeting. Defendant asked if she needed a lawyer. Corporal Houle told her that she could bring an attorney if she wanted one, but she would not be in custody during the meeting. During a second phone call on August 1, defendant agreed to meet Corporal Houle the following day at the Barre police station. Corporal Houle told her he wanted to speak to her about Larocque's death.

¶ 4. Defendant did not show up for the August 2 appointment. Corporal Houle contacted defendant and rescheduled their meeting, but again, defendant did not show. This time she left a voicemail informing Corporal Houle she had forgotten that she had to be in court in Woodstock that day. On August 6, Corporal Houle called defendant approximately ten times to no avail. Receiving no response from defendant to his many calls, Corporal Houle "got the impression that [d]efendant did not want to speak with him."

¶ 5. On August 7, Corporal Houle and Detective Pontbriand went looking for defendant. They received some information that she might be in the Chelsea area and went there to try to find her. As they drove into Chelsea, they saw defendant walk into a convenience store. The officers parked their unmarked car at the side of the store. Corporal Houle entered the store and called out to defendant. He told her that they "needed to talk" and asked her to follow him outside. Defendant silently complied.

¶ 6. Outside, pursuant to the officers' request, defendant placed her handbag on the officers' car, where it remained for the rest of her conversation with them. Corporal Houle asked defendant if she had any weapons on her and if he could check to confirm. Corporal Houle conducted a pat down, which did not reveal any objects.

2

¶ 7. During the ensuing conversation, defendant stood at the side of the store with her back to the building, facing the officers' car. The officers stood on either side of the front of the car, roughly three to four feet from defendant. This location was visible from the main road. While the three were speaking, other people entered and exited the store. The officers wore plain clothes except for a duty vest with "POLICE" printed on the back and a badge displayed on the front. They both had holstered firearms.

¶ 8. Corporal Houle told defendant he "knew she sold heroin at the Dollar General in Williamstown and that she had met someone during their lunch [break] to get heroin prior to delivering it to [Larocque]." He also said they "knew somebody else was involved and hopefully [defendant] would work with [them]." In his affidavit, Corporal Houle described their approach to defendant as, "you're on the hook, you're involved with this, we know you were—do you want to help us move up the chain and maybe get some consideration, because again, you're not the one who supplied it." He asked defendant if she would be willing to provide information on the individuals who supplied her with the drugs sold to Larocque. Defendant provided inculpatory information, including details regarding her sale of drugs to Larocque, but declined to share anything further for fear for herself and her family.

¶ 9. At no point during the discussion, which lasted between ten and twenty minutes, did the officers tell defendant she was free to leave or to not answer their questions. Defendant never requested to leave but believed she would have been arrested if she had tried to do so. She did not feel threatened and did not feel the officers were being dishonest in their conversation with her. Throughout the conversation, defendant was not handcuffed, and the officers' weapons remained holstered. At the conclusion of the conversation, the officers arrested defendant. At no time prior to her arrest was defendant informed of her Miranda rights.

¶ 10. Defendant was charged with selling or dispensing a regulated drug with death resulting, in violation of 18 V.S.A. § 4250(a). Defendant filed a motion to suppress her statements

3

made to the officers at the store in Chelsea, arguing these statements were obtained in violation of her rights under the Fifth Amendment of the U.S. Constitution and Chapter I, Article 10 of the Vermont Constitution. Based on the undisputed facts, the trial court concluded defendant had been subjected to a custodial interrogation. The trial court granted defendant's motion to suppress, holding the officers violated defendant's rights under the Fifth Amendment and Article 10 when they subjected her to a custodial interrogation without first providing Miranda warnings.

¶ 11. The State now appeals the trial court's grant of defendant's motion to suppress, arguing it improperly found that defendant was in custody during her conversation with police. "In reviewing a custody determination on a motion to suppress, we follow a two-step process." State v. Lambert, 2021 VT 23, ¶ 21, __ Vt. __, 255 A.3d 747. We accept the trial court's findings of fact unless clearly erroneous, and review the question of whether a suspect was in custody de novo. Id. In this case, there is no factual dispute and no claim any trial court finding is erroneous, so we proceed to a de novo review of the legal question of custody.

¶ 12. The Fifth Amendment and Article 10 provide individuals with a privilege against self-incrimination. U.S. Const. amend. V; Vt. Const. ch. I, art. 10. Article 10 and the Fifth Amendment are the same for the purposes of this right. State v. Rheaume, 2004 VT 35, ¶ 18, 176 Vt. 413, 853 A.2d 1259. To protect the privilege against self-incrimination, the U.S. Supreme Court established that an officer must use "procedural safeguards" before conducting a "custodial interrogation." Miranda, 384 U.S. at 444. These procedural safeguards, known commonly as Miranda warnings, require a suspect be informed that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Id. The remedy for a violation of one's Miranda rights is the suppression of statements made to an officer before warnings were provided. State v. Badger, 141 Vt. 430, 438, 450 A.2d 336, 341 (1982); Missouri v. Seibert, 542 U.S. 600, 608 (2004).

4

¶ 13.  The right to <u>Miranda</u> warnings is triggered at the onset of a "custodial interrogation."  <u>Miranda</u>, 384 U.S. at 444.  An individual is in custody for purposes of <u>Miranda</u> when " 'there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.' "  <u>State v. LeClaire</u>, 2003 VT 4, ¶ 16, 175 Vt. 52, 819 A.2d 719 (quoting <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983) (per curiam)).  The latter requires "an objective inquiry into the totality of the circumstances to determine if a reasonable person would believe he or she were free to leave or to refuse to answer police questioning."  <u>State v. Willis</u>, 145 Vt. 459, 475, 494 A.2d 108, 117 (1985).  This Court has identified a nonexhaustive list of factors to guide the inquiry into whether a person has been taken into " 'custody or otherwise deprived of his freedom by the authorities in any significant way.' "  <u>State v. Muntean</u>, 2010 VT 88, ¶ 17, 189 Vt. 50, 12 A.3d 518 (quoting <u>Miranda</u>, 384 U.S. at 487).  Those factors are:

> (1) whether the suspect was told he was free to terminate the conversation and leave; (2) the location of the interview; (3) whether the suspect arrived at the interview voluntarily; (4) the interviewer's communication to the suspect of his belief in the suspect's guilt; (5) the extent to which the suspect was confronted with evidence of guilt; (6) whether, and to what degree, the suspect's freedom of movement was restrained; (7) whether law enforcement used any deceptive techniques to conduct the interview; (8) the degree to which the suspect was isolated from the outside world; (9) duration of the interview; (10) whether the officers were armed; and (11) the number of officers present during the interview.

<u>Lambert</u>, 2021 VT 23, ¶ 19 (summarizing factors explained in <u>Muntean</u>, 2010 VT 88, ¶ 19).  In conducting this analysis, no single factor is dispositive.  See <u>Muntean</u>, 2010 VT 88, ¶ 19.  We apply those factors here in reaching our conclusion.

¶ 14.  As a starting point, the officers did not tell defendant she was free to leave.  This is "the most important factor" in the determination of custody because "[a] reasonable person's belief about whether the person is free to leave is necessarily influenced by the communication from police about the extent of the person's freedom."  <u>State v. Hieu Tran</u>, 2012 VT 104, ¶ 14, 193 Vt.

5

148, 71 A.3d 1201. Additionally, the officers did not tell defendant that she could decline to answer their questions. The State asks us to look to Corporal Houle's phone call with defendant six days prior, in which he told her she would not be in custody when meeting to speak with him, as informing her she was free to leave the encounter in Chelsea.

¶ 15. We decline to infer from Corporal Houle's informing defendant she would not be in custody if she had appeared at an earlier time that a reasonable person in defendant's situation would understand she was also not in custody during the interaction in question. First, this proposal is weakened by the five intervening days between this initial phone conversation and the interrogation. Second, a reasonable person in defendant's situation would interpret Corporal Houle's statements on the phone to mean she would not be in custody when coming to meet him at the police station for their appointment. However, the actual questioning occurred after defendant failed to appear at both appointments with Corporal Houle and failed to respond to his phone calls. It took place at a different location and time and resulted from the officers seeking her out, rather than her voluntarily coming to the police station at a scheduled time. As Miranda warnings themselves may become stale, so too may statements informing a defendant she is not in custody. See State v. Prue, 2016 VT 98, ¶ 32, 203 Vt. 123, 153 A.3d 551 (explaining fresh Miranda warnings may be required when time has elapsed between initial warning and inculpatory statement). Given the changed circumstances since defendant first spoke with Corporal Houle on the phone, a reasonable person would conclude the officer's original statement that she would not be in custody was no longer in play.

¶ 16. Narrowing in on the circumstances leading up to the interrogation, defendant did not arrive at the interview voluntarily. In evaluating this factor, we look not only to an individual's arrival but to her departure. See Muntean, 2010 VT 88, ¶ 19 (explaining that we ask "whether a suspect arrives at the interview voluntarily and whether he or she leaves by his or her own free will" (citing Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (per curiam)). Defendant initially

6

agreed to speak with Corporal Houle at the police station. However, she subsequently missed that meeting and the rescheduled meeting and then did not respond to Corporal Houle's phone calls. By Corporal Houle's own account, this gave the impression she did not wish to speak with him. It is undisputed that defendant was not obliged to attend these meetings. After defendant failed to attend the planned meetings, on August 7, the officers tracked her down in Chelsea. Ultimately, defendant's attempts to avoid speaking with police were overcome by the officers' own affirmative acts to contact her. Cf Mathiason, 429 U.S. at 494-96 (finding no custody where defendant voluntarily responded to officer's missed calls to arrange meeting). Furthermore, the officers' actions when they located defendant reinforce that the meeting was not voluntary on defendant's behalf. These facts include that Corporal Houle intercepted defendant at the store, called out her name, and told her he "needed to talk" to her.

¶ 17. The State argues that other facts demonstrate that defendant spoke to the officers voluntarily, including that defendant followed Corporal Houle outside without any protest. However, her silently following Corporal Houle outside demonstrates compliance, not voluntariness. See United States v. Griffin, 922 F.2d 1343, 1351 (8th Cir. 1990) (explaining custody is more likely to exist when interview "is instigated at the direction of law enforcement authorities"). Finally, defendant did not leave the interaction by her own free will as the interview concluded with her arrest. Her own statements that she did not feel free to leave or refuse to answer questions were therefore confirmed when she was arrested upon refusing to provide the officers with further information.

¶ 18. Next, we conclude there was a " 'restraint on freedom of movement of the degree associated with a formal arrest.' " Muntean, 2010 VT 88, ¶ 18 (quoting Beheler, 463 U.S. at 1125). "The position of the questioner(s) relative to the suspect is often important in a Miranda custody determination because it might substantially alter a suspect's perception of his or her freedom to leave." State v. Pontbriand, 2005 VT 20, ¶ 17, 178 Vt. 120, 878 A.2d 277. Defendant was

7

positioned between a wall to her back and a police car to her front, preventing her from leaving in either of those directions. Because the officers were situated on either side of the car, defendant could not leave without walking by at least one of the officers.

¶ 19. The location of defendant's purse also impacted her freedom of movement. Its placement on the car required defendant to attempt to leave without her purse or approach the car, and by extension the officers, to retrieve it before leaving. If she chose to do the former, this option would likely leave her walking around without her phone, wallet, keys, or other items people consider essential that are typically kept in a purse. See United States v. Salinas, 543 F. App'x 458, 464-65 (5th Cir. 2013) (per curiam) (explaining that police retention of suspects' phones or identification is evidence of custody); United States v. Harrold, 679 F. Supp. 2d 1336, 1345 (N.D. Ga. 2009) (weighing fact that officers took defendant's wallet and identification as factor in favor of custody); Keepers v. Commonwealth, 840 S.E.2d 575, 584 (Va. 2020) (identifying defendant's retention of purse, backpack, and phone as weighing against custody). If she chose to do the latter, it would bring her closer to the armed officers on either side of the car, thereby enhancing the physical element of being in a " 'police-dominated atmosphere.' " See Willis, 145 Vt. at 475, 494 A.2d at 117 (quoting Miranda, 384 U.S. at 445).

¶ 20. The character of the conversation between defendant and the officers, particularly confronting defendant with evidence of guilt, also indicates that defendant was in custody. When an officer communicates to a suspect a belief in the suspect's guilt, this contributes to a feeling that the suspect is not free to leave. Muntean, 2010 VT 88, ¶ 19 (citing Stansbury v. California, 511 U.S. 318, 325 (1994) (per curiam)). Furthermore, when an officer not only communicates belief in guilt but presents a defendant with evidence of guilt, the impression that one must stay and speak with the officer increases. Id.

¶ 21. In this case, Corporal Houle acknowledged that the officers' approach during this interview was to convey belief in her guilt and confront her with evidence of her guilt. In his

8

words, they indicated to defendant "you're on the hook, you're involved with this, we know you were." He specifically told defendant he "knew she sold heroin," and provided her with the details of where, when, and to whom she sold those drugs. It is important to note that the officers' allegations involved not only defendant's sale of drugs but the sale of drugs to a person who died as a result, signaling to defendant they had evidence that she was guilty of a serious crime. See id. ¶ 28 ("A reasonable person would not feel at liberty to terminate a police interview after being confronted with [evidence of guilt of a serious crime], as a reasonable person understands that police ordinarily will not set free a suspect when there is evidence strongly suggesting that the person is guilty of a serious crime." (quotation omitted)).

¶ 22. We are not persuaded by the State's argument that the fact that the officers attempted to recruit defendant as a confidential informant weighed against custody because defendant should have understood the officers were looking for "help." First, the officers' invitation to cooperate to get the "bigger fish" was based on the communication of their belief in defendant's guilt described above. Second, the officers' approach implied defendant could get some "consideration" by helping them. See United States v. Familetti, 878 F.3d 53, 59 (2d Cir. 2017) (explaining invitation to cooperate can be inculpatory when "an undertaking to help or cooperate necessarily bespeaks criminal involvement"); Meredith v. State, 906 N.E.2d 867, 874 (Ind. 2009) (including whether officers suggest defendant cooperate in nonexhaustive list of factors to determine custody for statutory question). A prediction that cooperation would be looked upon favorably in charging communicates to an individual that she needs to cooperate to begin mitigating the consequences of her guilt. For these reasons, a reasonable person would not believe she was free to leave based on the fact that officers were seeking her "help" as communicated in this case.

¶ 23. Finally, we look at the location of the interview. "[T]he location of the interview and the nature of the physical setting where the interview occurred are persuasive factors in the

custody calculus." Muntean, 2010 VT 88, ¶ 23. Custody is more likely if the location causes the individual to be "isolated from the outside world." Id. ¶ 19. Here, the location of the interview does not indicate custody. Defendant was outdoors, in a public setting, with people walking in and out of the store near where she stood.

¶ 24. The State highlights the location and points to other factors weighing against custody. These include: the fact that defendant felt the officers were not using deceptive techniques, see State v. Manning, 2015 VT 124, ¶ 27, 200 Vt. 423, 132 A.3d 716 (emphasizing lack of "any deceptive or otherwise coercive interrogation techniques" in concluding defendant was not in custody); the relatively short duration of the interview at ten to twenty minutes, see Lambert, 2021 VT 23, ¶ 33 (finding length of twenty-one minute interview to point against custody); and the fact that there were only two officers present, see Pontbriand, 2005 VT 20, ¶ 31 (concluding defendant was not in custody when questioned by two officers in semi-public area). Although these circumstances weigh against custody, our mandate is to evaluate the totality of the circumstances, not each factor in isolation. Muntean, 2010 VT 88, ¶ 19. In doing so, we do not conduct a quantitative analysis where we tally factors "for" versus "against" custody and the side with the greatest number wins. See State v. Olney, 2009 VT 116, ¶ 32, 187 Vt. 56, 989 A.2d 995 (explaining questions of custody are "fact-specific").

¶ 25. Here, the totality of the circumstances indicates that defendant was in police custody at the time of questioning. The most significant factors supporting this conclusion are: defendant was not told she was free to leave or could refuse to speak with the officers; she did not come to the interview voluntarily; her freedom of movement was significantly restrained during her discussion with the officers; and police presented her with evidence of guilt during the interview. Under the totality of the circumstances, a reasonable person would not feel free to leave or to refuse to answer police questioning. Because defendant was subjected to a custodial

interrogation and officers failed to provide defendant with her <u>Miranda</u> warnings, defendant's statements must be suppressed.

<u>Affirmed</u>.

FOR THE COURT:

_____

Associate Justice